# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

| | | |
|---|---|---|
| EVELYN KELLY, | § | |
| | § | |
| Plaintiff, | § | Civil Action No.: |
| | § | 3:14-CV-1590-B |
| v. | § | |
| | § | |
| ST. LUKE "COMMUNITY" UNITED | § | |
| METHODIST CHURCH, REV. HENRY | § | |
| MASTERS, in his official and individual | § | |
| capacity, AND BERNICE WASHINGTON, | § | |
| in her official and individual capacity. | § | |
| | § | |
| Defendants. | § | **JURY TRIAL DEMANDED** |

## DEFENDANTS ST. LUKE "COMMUNITY" UNITED METHODIST CHURCH'S, REV. HENRY MASTERS' AND BERNICE WASHINGTON'S
## BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

I. SUMMARY OF THE ARGUMENT ............................................................................. 1
    SEX DISCRIMINATION............................................................................... 2
    AGE DISCRIMINATION................................................................................ 3
    RETALIATION ............................................................................................... 3
    ERISA/COBRA ............................................................................................. 3
    DUE PROCESS .............................................................................................. 4
    FRAUD/MISREPRESENTATION ................................................................ 4
    NEGLIGENCE ............................................................................................... 4
    DEFAMATION .............................................................................................. 4
II. PROCEDURAL HISTORY ................................................................................... 5
III. STATEMENT OF UNDISPUTED MATERIAL FACTS...................................... 5
IV. FACTUAL BACKGROUND ................................................................................ 6
  A.  Relevant Background Regarding Plaintiff Evelyn Kelly................................. 6
    a.  St. Luke Is An Equal Opportunity Employer................................. 6
    b.  Ms. Kelly's Tenure with St. Luke .................................................. 6
    c.  St. Luke's Reorganization Plan And The Basis For The Elimination Of Ms. Kelly's Position. .............................................................................................. 7
    d.  The Hiring of the New Church Administrator and Division of the Duties of the DOHR Position ................................................................................................ 10
    e.  Release of additional St. Luke employees................................... 11
V. STATEMENT OF LEGAL ISSUES........................................................................ 11
VI. ARGUMENT AND AUTHORITIES.................................................................... 13
    A. Summary Judgment Standard. ....................................................... 13
    B. Ms. Kelly Has No Legitimate Sex, Age or Retaliation Claims Pursuant to Texas Commission on Human Rights Act.................................................... 14
    C. Ms. Kelly's claims regarding St. Luke's violations of ERISA/COBRA fail since St. Luke is a church.......................................................................... 30
    D. Ms. Kelly's Due Process claims fail since the court cannot contravene ecclesiastical  decisions made by St. Luke........................................ 31
    E. Ms. Kelly's Claims of Fraud and Misrepresentation Fail as a Matter of Law.......... 35
    F.  Ms. Kelly's Negligence Claims Fail as a Matter of Law since Ms. Kelly cannot establish a Prima Facie Case of Negligence against St. Luke. ............................... 38
    G. Ms. Kelly's Defamation (Per se and Per Quod) Claims must Fail Since Any Statements Made by Rev. Masters and Ms. Washington Were True. ...................... 41
VII. CONCLUSION.................................................................................................... 47

# TABLE OF AUTHORITIES

## Cases

*ACE Am. Ins. Co. v. Freeport Welding & Fabricating, Inc.*, 699 F.3d 832, 839 (5th Cir. 2012).13

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)...............................................13

*AutoZone, Inc. v. Reyes*, 272 S. W. 3d 588 (Tex. 2008)........................................................15

*Bagby v. General Motors Corp.*, at 6 F.2d 919( 5th Cir. 1992) .............................................43

*Baker*, 430 F. 750, 755 (5th Cir. 2005)...............................................................................28

*Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 957 (5th Cir.1993).........................................25

*Brown v. City of Hous.*, 337 F.3d 539, 541 (5th Cir. 2003)...................................................13

*Brown v. Sweet & Crawford of Tex., Inc.*, 178 S. W. 3d 373, 382 (Tex. App-Houston 2005, no pet)...................................................................................................................................42

*Bryan v. McKinsey & Co., Inc.*, 375 F.3d 358, 360 (5th Cir. 2004).......................................16

*Burlington Northern & Santa Fe Ry. Co. v. White,* 126 S. Ct. 2405 (2006) .........................17, 27

*Calvin v. Red Steel Co.*, 682 S.W. 2d 243, 245 (Tex. 1984)..................................................39

*Carr v. Brasher* 776 S.W.2d 567, 570 (Tex. 1989) .............................................................44

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)........................................................13

*City of Waco v. Lopez*, 259 S.W. 3d 147, 153-55(Tex.2008) .................................................14

*Crutcher v. Dallas Independent School Dist.*, 410 S. W. 3d 487 (Tex.App.-Dallas 2013) ....14, 27

*Danawala v. Houston Lighting and Power Co.,* 14 F.3d 251, 255 (5th Cir. 1993).....................44

*Dollis v. Rubin*, 77 F. 3d 777, 781-82 (5th Cir.1995)...........................................................17

*Douglas v United Servs. Auto. Ass'n.* 79 F. 3d 1415, 1429 (5th Cir. 1996)..............................19

*Firestone Steel Products Co. vs. Barajas,* 927 S.W. 2d 608, 613 (Tex. 1996)...........................38

*First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968). .................................14

*Formosa Plastics Corp v. Presido Eng'rs and Contractors, Inc.* 960 S.W.2d 41, 47-48 ...........36

*Hassee v. Glazner*, 62 S.W. 3d 785, 798 (Tex. 2001) ..........................................................36

*Hosanna Tabor-Evangelical Lutheran Church and School v Equal Employment Opportunity Commission* 132 S. Ct. 694 (2012)...................................................................................31

*Howell v. Hecht*, 821 S.W.2d 627, 631 (Tex. App – Dallas 1991, writ denied).......................44

*Jackson v. Metropolitan Edison Co.*, 419 U. S. 345, 349-50 (1974) ......................................33

*Joseph E. Seagram & Sons, Inc. v. McGuire*, 814 S.W. 2d 385, 387 (Tex. 1991) ....................38

*Kanida v. Gulf Coast Med. Pers. LP*, 363 F.3d 568, 574-75 (5th Cir. 2004).............................17

*Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in North America,* 344 U. S. 94, 116, 73 S. Ct. 143, 97 L. Ed. 120 (1952)...................................................................32

*Lugar v. Edmondson Oil Co, Inc.*, 457 U. S. 9223 (1982) ....................................................33

*Martineau v. Arco Chemical Company*, 1998 WL 1173513 *13 (S.D. Tex. 1998).....................44

*Matsuhita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)..................14

*Mattern v. Eastman Kodak Co.*, 104 F. 3d 702, 707 (5th Cir. 1997) .......................................17

*McDonnell Douglas Corp v. Green*, 411 U. S. 792, 802 (1973)........................................15, 16

*Mission Consol. Independent School Dist. v. Garcia*, 372 S. W. 3d 629,642 (Tex. 2012)..........25

*Munoz v. Orr*, 200 F.3d 291, 299 (5th Cir. 2000) ...............................................................16

*NME Hosps., Inc. v. Rennels.* 994 S. W. 2d 142, 144 (Tex.1999)............................................14

*O'Connor v. Consolidated Caterers Corp.*, 517 U.S. 308, 312-13, 116 S. Ct. 1307, 1310 (1996) ...........................................................................................................................26

*Pacheco v. Mineta*, 448 F.3d 783, 787 (5th Cir. 2006) ........................................................16

*Pineda v. United Parcel Service, Inc.* 360 F. 3d 483 (5th Cir. 2004).......................................27

*Quantum Chemical Corp. v. Toennies*, 47 S. W. 3d 473 (Tex. 2001)..........................................14

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)..............................13, 16

*Rendell-Baker v. Kohn*, 457 U. S. 830, 837 (1982)....................................................................33

*Rifakes v. Citizens Co.*, 968 F. Supp. 315 (N.D. Tex. 1997) ...................................................25

*Russo v. Smith Intern, Inc.,* 93 S.W. 3d 428 (Tex. App-Houston [14th Dist.]2002)...................25

*Serbian Easter Orthodox Diocese for United States and Canada v. Milivojevich*, 426 U.S. 696, 96 St. Ct. 2372, 49 L. Ed. 2d 151 (1976)..................................................................................32

*Snyder Commens, L.P. v. Magana,* 142 S.W.3d 295, 298 (Tex. 2004)......................................36

*Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981) ................................16

*Westfall v. GTE North Inc.,* 956 F. Supp. 707 (N.D. Tex 1996)................................................15

*WFAA-TV, Inc. v. McLemore*, 978 S. W. 2d 568, 571 (Tex.1998) ............................................42

**Statutes**

26 U.S.C.A. § 4980B ............................................................................................................30, 31

42 U.S.C. §2000e .........................................................................................................................28

I.R.C. § 414(e) ............................................................................................................................30

Texas Labor Code §21.001............................................................................................................14

Worker's Adjustment Retraining Act ("WARN") 29 U.S.C. Chapter 23, 29 U.S.C. §2101(a)(1)(A)............................................................................................................................24

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| EVELYN KELLY, | § | |
| | § | |
| Plaintiff, | § | Civil Action No.: |
| | § | 3:14-CV-1590-B |
| v. | § | |
| | § | |
| ST. LUKE "COMMUNITY" UNITED | § | |
| METHODIST CHURCH, REV. HENRY | § | |
| MASTERS, in his official capacity | § | |
| and individual capacity, AND BERNICE | § | |
| WASHINGTON in her official | § | |
| capacity and individual capacity. | § | |
| | § | |
| Defendants. | § | **JURY TRIAL DEMANDED** |

**DEFENDANTS ST. LUKE "COMMUNITY" UNITED METHODIST CHURCH'S, REV.
HENRY MASTERS' AND BERNICE WASHINGTON'S BRIEF
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

**TO THE HONORABLE JUDGE OF SAID COURT:**

COMES NOW, Defendants St. Luke "Community" United Methodist Church, ("St. Luke")
Reverend Henry Masters ("Rev. Masters") in his official and individual capacity and Bernice
Washington ("Ms. Washington") in her official and individual capacity, and file this Brief in Support
of their Motion for Summary Judgment pursuant to Local Rule 56.5, stating as follows:

**I.**
**SUMMARY OF THE ARGUMENT**

1.      Evelyn Kelly ("Ms. Kelly") if a former employee of St. Luke who served as the
Director of Operations and Human Resources ("DOHR") from January of 2001until February 12,
2013. Rev. Masters was the senior pastor of St. Luke from July 2012 until June 30, 2014. Ms.
Washington has served as chairperson of St. Luke's Staff Pastor Parish Relations Committee
("SPPRC"), the Church committee charged with handling personnel matters, from January 2011
until the present. This case arises from St. Luke's decision to eliminate Ms. Kelly's position, thus
her employment. Ms. Kelly claims that her termination was wrongful for the following reasons: 1) it
violated prohibitions against sex and age discrimination in violation of the Texas Commission on

Human Rights Act (TCHRA) ; 2) her termination was the result of retaliation for complaining about activity protected by the TCHRA; 3) St. Luke failed to give her notices required by the Employee Relations Income Security Act ("ERISA") and Consolidated Omnibus Budget Reconciliation Act ("COBRA"); and 4) St. Luke violated her Due Process Rights by failing to follow Church policy. In addition, Ms. Kelly claims her termination was procured by fraud, misrepresentation and negligence committed St. Luke.   Finally, she asserts defamation claims based on both the manner of and statements made during the course of her termination by Rev. Masters and/or Ms. Washington.  For the reasons set forth below, there is no material issue of fact regarding any claim Ms. Kelly asserts and the Defendants are entitled to Summary Judgment dismissing all claims.

## SEX DISCRIMINATION

2.      St. Luke is entitled to summary judgment on Ms. Kelly's TCHRA claims of sex discrimination. Ms. Kelly cannot establish a prima facie case of sex discrimination because the alleged conduct of Rev. Masters, i.e. raising his voice at Ms. Kelly during two phone conversations and use of a disrespectful tone do not constitute  adverse employment actions nor establish that she was treated differently than similarly situated co-workers.  Moreover, the conduct did not affect her compensation, terms, conditions and privileges of employment.

3.      In addition, St. Luke is entitled to summary judgment regarding Ms. Kelly's sex discrimination claim based upon: Rev. Masters  (1) belief that her salary was too high, (2) request to have her salary reduced and (3) misrepresentation of the  reorganization at St. Luke because such actions do not constitute ultimate employment decisions.

4.      Further, even if the aforementioned conduct is actionable, St. Luke had legitimate business reasons for the elimination of Ms. Kelly's position as DOHR, i.e., the church sustained a major transition due to the departure of its former senior pastor and needed to invest in activities to increase church membership.

5.      In addition, St. Luke is entitled to summary judgment because the person who assumed most of Ms. Kelly's core human resource duties as the new Church Administrator was another female, Rev. Sharon Larkin.   St. Luke's failure to consider Ms. Kelly for the new position, notwithstanding her failure to apply, does not constitute sex discrimination.

6.      Finally, St. Luke is entitled to summary judgment regarding Ms. Kelly's sex discrimination claim because Ms. Kelly cannot establish pretext for the alleged discrimination.

## AGE DISCRIMINATION

7.      St. Luke is entitled to summary judgment on Ms. Kelly's age discrimination claim because Ms. Kelly testified that the "sole basis" for her age claim were provisions she read in an unnamed statute which "required St. Luke to offer her another position at the church, outplacement services and other benefits" after her termination. (*See* Appendix pp. 15-19 and 24-25, Dep. Evelyn Kelly ("Kelly") attached hereto and incorporated herein as Exhibit A pp. 79-83, 89-90.) There is no statute which requires St. Luke to take such action.

8.      Further, St Luke is entitled to summary judgment regarding  the following age discrimination claims because Ms. Kelly cannot establish: (1)  that she was treated differently in terms of her compensation, terms or privileges of employment because of her age, (2)  Rev. Masters thought her salary was too high because of her age,  (3)  Rev. Masters misrepresented   that a reorganization at St. Luke  was imminent because of her age, (4)  St. Luke hired  another employee who assumed substantially  all of Ms. Kelly's former duties  because of Ms. Kelly's age, and (5) Ms Kelly was never considered for the Church Administrator position because of her age.

9.      St. Luke is further entitled to summary judgment regarding Ms. Kelly's age discrimination claim because St. Luke had legitimate business reasons to release Ms. Kelly from her position, i.e. the church was experiencing a major transition and needed to invest in activities to increase church membership.

10.     Finally, St. Luke is entitled to summary judgment on Ms. Kelly's age discrimination claim because she cannot establish that St. Luke's reasons for abolishing her position were pretextual.

## RETALIATION

11.     St. Luke is entitled to summary judgment regarding Ms. Kelly's retaliation claims since Ms. Kelly cannot establish that (1) she engaged in "protected activity"; (2) she was subjected to an action that a reasonable employee would have found materially adverse; and (3) there is a causal link between the "protected activity" and the adverse employment action.

## ERISA/COBRA

12.     St. Luke is entitled to ERISA/COBRA summary judgment regarding Ms. Kelly's ERISA/COBRA claim because the provision of the statute requiring the submission of notice does not apply to churches.

## DUE PROCESS

13.     St. Luke is entitled to summary judgment regarding Ms. Kelly's due process claim because the Court cannot alter ecclesiastical decisions made by St. Luke.

14.     St. Luke is entitled to summary judgment regarding Ms. Kelly's due process claims because St. Luke is not a governmental entity and due process claims cannot arise from provisions of the Book of Discipline, the governing authority adopted by the United Methodist Church, or St. Luke's Personnel Practices Manual.

## FRAUD/MISREPRESENTATION

15.     St. Luke is entitled to summary judgment on Ms. Kelly's fraud and misrepresentation claims because: (a) St. Luke had no duty to keep the elimination of Ms. Kelly's position confidential; (b) St. Luke's statements regarding the scope of responsibilities for the new Church Administrator position were true;  (c) the mere presence of a police officer at the time of Ms. Kelly's release of employment does not create an actionable claim of misrepresentation and fraud; and (d) Ms. Kelly did not rely upon any actions of St. Luke to her detriment.

## NEGLIGENCE

16.     St. Luke is entitled to summary judgment on Ms. Kelly's negligence claim because St. Luke owed no legal duty to (1) maintain confidentiality regarding the fact that Ms. Kelly's position was abolished and she was released from her employment; (2) discuss the potential abolishment of Ms. Kelly's position with St. Luke's Personnel Committee, a Sub-Committee of the SPPRC, and (3)  speak with Ms. Kelly about the abolishment of her position before making the decision to abolish the DOHR position.

## DEFAMATION

17.     Rev. Masters and Ms. Washington are entitled to summary judgment on Ms. Kelly's defamation claim  because (a) as a matter of law having an uniformed off-duty police officer escort an employee from the premises following termination does not constitute defamation; (b) informing persons at St. Luke that Ms. Kelly's position had been eliminated and she no longer worked at the church was not defamatory because the statements were true; and; (c) any reference to Ms. Kelly as "volatile" is not actionable because it was not published, constituted an opinion and was not made as a statement of fact by Rev. Masters or Ms. Washington.

18.     As a result of all the foregoing, the defendants are entitled to Summary Judgment

dismissing Ms. Kelly's Second Amended Complaint in its entirety.

## II.
## PROCEDURAL HISTORY

19.     Ms. Kelly filed her Original Petition and Jury Demand with the 95th Judicial District Court, Dallas County, on January 30, 2014, alleging claims of fraud, misrepresentation and negligence against St. Luke. She also alleged claims of defamation per se by Rev. Masters and Ms. Washington, *See Original Petition* [Dkt. No.1, Apx1-12.] On April 4, 2014, Ms. Kelly filed a First Amended Petition and Jury Demand raising the same claims as cited above and adding claims of sex and age discrimination in violation of the TCHRA and, an alleged ERISA/COBRA violation. She expanded her defamation claims against Rev. Masters and Ms. Washington to include claims of defamation per se and per quod. *See First Amended Petition* [Dkt. No. 1, Apx 1-5.]. On April 30, 2014, Defendants filed removal pleadings pursuant to 28. U.S.C. §1441 (Federal Question). *See Notice of Removal* [Dkt. No. 1.] On December 15, 2014, Ms. Kelly filed a Motion for Leave to file a Second Amended Complaint and Jury Demand. *See Second Amended Petition* [Dkt. No. 10.] This Court granted the Motion on January 14, 20915. *See Order* [Dkt. No. 13.]

## III.
## STATEMENT OF UNDISPUTED MATERIAL FACTS

20.     St. Luke is a local Dallas church, part of the North Texas Conference, associated with the United Methodist Church.  It is not a governmental entity.

21.     Ms. Kelly's claims of sex discrimination are based upon two phone conversations with Rev. Masters in which he raised his voice.

22.     Ms. Kelly's age discrimination claim is based upon her reliance on an unnamed statute which allegedly required St. Luke to offer her another position at the church, outplacement services and other benefits.

23.     After Ms. Kelly's release from employment, she never applied for the position of Church Administrator with St. Luke.

24.     St. Luke hired no one after Ms. Kelly's release who assumed all of Ms. Kelly's former responsibilities as the DOHR.

25.     Rev. Sharon Larkin assumed several of Ms. Kelly's former duties when she was hired to serve as the new Church Administrator . Rev. Larkin did not assume all of Ms. Kelly's prior duties.  Rev. Larkin is a female who is fifty-one (51) years of age.

26.     The Director of Evangelism, Velda Turner is over 50 years of age.

27.     Two summer hire positions were also eliminated during 2013 because of the reorganization and financial condition of St. Luke. The positions had been occupied by two female employees in their twenties.

## IV.
## FACTUAL BACKGROUND

### A.     Relevant Background Regarding Plaintiff Evelyn Kelly.

#### a.     St. Luke Is An Equal Opportunity Employer.

28.     St. Luke is an equal opportunity employer.  Its Equal Employment Policy states as follows:

> St. Luke... shall adhere to a policy of equal employment opportunity for all persons.  The church will not, on the basis of race, sex, color, age, handicap, national origin, or religion, limit, segregate, classify employees or applicants for employment in any way that would deprive or tend to deprive any individual of employment opportunities or otherwise affect the individual's status as an employee.     Accordingly, St. Luke forbids all forms of discrimination in employment, including on account of sex and age.  Further, retaliation is prohibited.[1]

#### b.     Ms. Kelly's Tenure with St. Luke.

30.     Ms. Kelly served as the Director of Operations and Human Resources for St. Luke from January 19, 2001, until February 12, 2013, when St. Luke eliminated the position.  (*See* Appendix pp.59-62, Affidavit of Rev. Sharon Larkin, ¶ 11 Exhibit B, p. 2-3.)

31.     As the DOHR, Ms. Kelly's job description was as follows:

- Responsible for implementation of the annual budget as developed by the Church Director and the Director of Finance and Stewardship.
- Provides overall direction for all nonpastoral Church activities and functions, including, but not limited to, human resources, clerical support, community-based programs, office management, buildings and grounds, security services, nursery services and safety.  In addition, this position assumes responsibility for non-pastoral functions for music, media, adult, children and youth services.

---

1 (*See Appendix* pp. 59-62, Affidavit from Rev. Sharon Larkin ("Larkin") ¶ 10, attached hereto and incorporated herein as Exhibit B and Appendix p. 64, Excerpts from St. Luke's Personnel Practices Manual attached hereto and incorporated herein as Exhibit B-1, p. 8.)

- Develops and implements policies and procedures as well as goals for each area of responsibility and is accountable for the administration of the Human Resources budget.
- Develops ongoing training programs for non-pastoral areas to ensure that the level of customer service provided to the congregation, visitors, staff and lay leaders of the Church is continuously improved.
- Assists in the preparation of reports for Church Charge Conference, monthly meetings and staff meetings.
- Reviews and approves the strategic plan for Finance, Nursery, Building, Maintenance, and Security Operations.
- Reviews and approves budgets for all operations.
- Responsible for implementing a purchasing policy and procedure to include guidelines for vendor relations.
  Attends meetings of the Church Council, Executive Committee, Trustees, Personnel Committee, Building Committee, and other meetings as assigned by Senior Pastor[2].

### c.   St. Luke's Reorganization Plan And The Basis For The Elimination Of Ms. Kelly's Position.

32.     During 2012 and the early portion of 2013, St. Luke was a church in transition after the well-publicized resignation of its previous senior pastor, which resulted in considerable reductions in worship attendance and financial income for the church. (*See* Appendix pp. 113-116, *Affidavit* of Rev. Henry Masters, ¶4, ("Masters") attached hereto and incorporated herein as Exhibit C, pp. 1-3.)   In fact, revenue from St. Luke decreased by more than thirty-three (33%) or $1.25 million dollars from 2005 to 2012. (*See* Appendix pp. 145-147 Affidavit of Ollie Adams ("Adams"), ¶ 4, attached hereto and incorporated herein as Exhibit D, p. 1. and Appendix p. 149 Budget & Revenue History attached hereto and incorporated herein as Exhibit D-1.)

33.     Rev. Masters became the new Senior Pastor for St. Luke effective July 1, 2012. (See Appendix pp. 168 Dep. Rev. Henry Masters ("Masters") attached hereto and incorporated herein as Exhibit E, p. 8.)   As early as September of 2012, the church looked at a number of areas to reduce costs and expenses, which included possible personnel reductions. (*See* Appendix pp. 145-147, Affidavit of Ollie Adams, ¶5 p. 1, Exhibit D and Appendix pp. 151-156. St. Luke "Community" UMC Finance Committee Meeting Minutes, September 20, 2012, St. Luke Budget Reduction Proposals for 2012 (Revised 9/20/2012) and St. Luke's 2013 Budget Proposal, all attached hereto

---

2 *See* Appendix pp. 59-62, Affidavit of Rev. Larkin ¶10 Exhibit B and Appenidx pp. 72-73 the Job Description for the Director of Operations and Human Resources attached hereto and incorporated herein as Exhibit B-2.

and incorporated herein respectively as Exhibit D-2.)  On October 9, 2012, the Church Council approved the initial changes for the reorganization of the church's internal structure related to programming and staff.  (*See* Appendix pp. 145-147 Affidavit of Ollie Adams, ¶ 6, Exhibit D p. 2.)

34.    On January 5, 2013, Rev. Masters, with the assistance of "A Vision Team", began to develop a new mission/vision for St. Luke as a result of the aging congregation and the need to incorporate the voices of St. Luke's youth. (*See* Appendix pp. 113-116, Affidavit of Rev. Masters, ¶ 4, pp. 1-2, Exhibit C; Appendix p. 118, Email to members of the Vision Team dated December 20, 2012 regarding the meeting on January 5, 2013, attached hereto and incorporated herein as Exhibit C-1) and Appendix pp. 191-192 Minutes of the SPRRC dated January 7, 2013[3] attached hereto and incorporated herein as Exhibit G-1.) The plan called for the incorporation of a programmatic structure at St. Luke, which adopted the Nurture, Outreach, and Witness (N.O.W.) design, one of the foundational tenets of the United Methodist Church. (*See* Appendix pp. 113-116 Affidavit of Rev. Masters ¶¶5-7, pp. 1-2, Exhibit C and Appendix pp. 120-136 Radical Hospitality (Vision Team Materials) attached hereto and incorporated herein as Exhibit C-2. The *thrust of* the reorganization was to place more focus on the program ministries of the church and to develop more comprehensive services through the Nursery Ministry and Breadbasket program. The plan also included a new part-time position for a Director of Evangelism. *See* Appendix pp.113-116, *Affidavit* of Rev. Masters ¶ 6, Exhibit C, and Appendix p. 138Staff Revisions Proposal attached hereto and incorporated herein as Exhibit C-3. Rev. Masters' plan was to use the full-time ministerial staff to work with internal church committees and programs to enhance the delivery of services to its members and members of the community as well as providing more assistance for the day-to-day operations of the church.  As a result, the need for staff member services would be reduced.  *See* Appendix pp. 113-116 the Affidavit of Rev. Masters ¶¶ 8-11, Exhibit C and Appendix pp. 175-184 the Dep. of Dr.Troy Coleman ("Coleman") attached hereto and incorporated herein  as Exhibit F pp. 14-17.)

35.    Rev. Masters met with the members of the SPPRC on January 7, 2013, to present his vision for St. Luke. (*See* Appendix pp. 186-189 Affidavit of Bernice Washington ¶5, Exhibit G and Appendix pp. 191-192 Exhibit G-1 Minutes of the January 7, 2013 meeting.)  The SPPRC *has authori*ty to hire, contract, evaluate, promote, retire and dismiss non-appointed personnel. (*See* Appendix pp. 186-189 Affidavit of Bernice Washington, ¶ 3, Exhibit G, p. 1, and Appendix pp. 75-

---

3 *See* Appendix pp. 186-189 Affidavit of Bernice Washington ("Washington") ¶4, attached hereto and incorporated herein as Exhibit B-2 pp. 1-2.

82, and Excerpts from Section 258.2(g)(12) the Book of Discipline for the United Methodist Church attached hereto and incorporated herein as Exhibit B-3, pp. 178-184.)[4]

36.    On January 31, 2013, Rev. Masters appeared before the SPPRC and provided his proposal regarding the staff reorganization plan. (*See* Appendix pp. 113-116 Affidavit of Rev. Masters, ¶ 8, Exhibit C and Appendix pp. 140-141 Letter from Rev. Masters to Bernice Washington, Chair of the SPPRC attached hereto and incorporated herein as Exhibit C-4.) The proposal eliminated the DOHR position and created a Church Administrator position with fewer functional responsibilities than the DOHR position. In addition, the plan created a Director of Evangelism position. (*See* Appendix pp. 113-116 Affidavit of Rev. Masters, ¶ 9, Exhibit C p. 2 Appendix pp 84-86, and Job Description for the Church Administrator position[5], attached hereto and incorporated herein as Exhibit B -4.) The reduction of tasks and responsibilities meant that the Church Administrator position would not support the same salary as the DOHR position. The change of positions allowed the church to use Twenty-two thousand dollars ($22,000) of the DOHR salary to help fund the part-time position of Director of Evangelism.[6] (*See* Appendix pp. 113-116, Affidavit of Rev. Masters, ¶¶ 9-11, Exhibit C and Appendix p. 138 Staff Revision Proposal Exhibit C-3 pp. 1-2. SPPRC approved the proposal. *See* Appendix pp. 196-199 Minutes of the SPPRC Meeting[7] dated January 31, 2013 attached hereto and incorporated herein as Exhibit G-3.)

37.    On February 1, 2013, Rev. Masters and the Chair of the SPPRC, Ms. Washington met with Ms. Kelly and provided her with a letter explaining that her position was eliminated. (*See* Appendix pp. 220-221 Dep. of Bernice Washington ("Washington") attached hereto and incorporated herein as Exhibit H pp. 47-48 and Letter of Termination[8] dated February 1, 2013 attached hereto and incorporated herein as Exhibit B-5.) Before Ms. Kelly arrived at the church on February 1, 2013, Rev. Masters met with other staff members and advised them that Ms. Kelly's position had been eliminated and discussed the transition process. (*See* Appendix pp. 169-173, Dep. Rev. Masters, Exhibit E pp. 49-53.)

---

4 (*See* the Affidavit of Rev. Larkin, ¶ 12, Exhibit B, p. 3.)
5 (*See* Appendix pp. 59-62, Affidavit of Rev. Larkin, ¶ 12, Exhibit B, p. 3.)
6 During 2013, Velda Turnley a fifty-five (55) year old female held the Director of Evangelism position at St. Luke. (*See* Appendix pp. 59-62 Affidavit of Rev. Larkin, ¶11, Exhibit __ p. 2.)
7 (*See* Appendix pp. 186-189 Affidavit of Bernice Washington, ¶ 7, Exhibit G p. 2.)
8 *(See* Appendix pp. 59-62 Affidavit of Rev. Sharon Larkin, ¶ 12, Exhibit B p. 3).

### d. The Hiring of the New Church Administrator and Division of the Duties of the DOHR Position.

38.     As part of the reorganization process, St. Luke ultimately filled the position of Church Administrator with Rev. Sharon Larkin[9]. (*See* Appendix pp. 59-62 Affidavit of Rev. Larkin, ¶ 2 Exhibit B, p. 1. The position of Church Administrator is different from Ms. Kelly's former position of DOHR. (*See* Appendix pp. 59-62, Affidavit of Rev. Larkin, ¶¶ 3-4 Exhibit B and Appendix pp. 84-86 the Position Description of the Church Administrator, Exhibit B-4, pp. 1-2.)

39.     Previously the DOHR was intimately involved in the financial operations of the church, building and grounds, nursery, music, safety and a host of other areas. (*See* Appendix pp. 72-73 Job Description DOHR, Exhibit B-2, pp. 1-2.) By comparison, the Church Administrator is responsible for the core human resources duties at St. Luke. (*See* Appendix pp. 59-62 Affidavit of Rev. Larkin, ¶ 3 Exhibit B, p. 1. The Church Administrator was no longer required to perform many of the responsibilities Ms. Kelly had performed. For example during 2013, the Church Administrator was not required to perform the following duties: (1) develop policies and procedures; (2) review or approve strategic plans for the Finance Committee; (3) to attend meetings of the Church Council, Executive Committee, Trustees, Finance Committee and Building Committee; (4) serve as the sole administrative liaison for the Finance Committee hold a Church credit card; or (5) approve budgets[10]. *See* Appendix pp. 59-62, Affidavit of Rev. Larkin, ¶ 4 Exhibit B, pp. 1-2.)

40.     As previously stated, members of the ministerial staff assumed some of Ms. Kelly's responsibilities. (*See* Appendix pp. 180-181 Dep. Coleman, Exhibit F pp. 29-30.) Further, Ollie Adams, the Chief Financial Officer of the church, assumed some of Ms. Kelly's financial operations responsibilities.[11] (*See* Appendix pp. 145-147, Affidavit of Adams ¶¶ 8-10, Exhibit D, p. 2.) Mr. Adams specifically assumed the responsibility for developing and implementing purchasing policy guidelines for vendor relations. (*See* Appendix pp. 145-147, Affidavit of Adams ¶ 8, Exhibit D, p. 2.) Adams also became the sole staff liaison with the Finance Committee and became the sole holder of the Church credit card. Mr. Adams did not receive an increase in salary when he assumed

---

9 The Church Administrator position was an open posted position. Ms. Kelly could have applied for the position, but never submitted an application. (*See* Appendix pp. 26-27 and 29-33, Dep. Kelly, Exhibit A, pp. 93-94, 118-122.)
10 Even the Lay Leader, Dr. Coleman acknowledged differences between the two positions. *See* Appendix pp. 182-184 Dep. Coleman pp. 51, 58-59.
11 Ollie Adams, the Chief Financial Officer is fifty-five (55) years of age. *(See* Appendix pp. 145-147 Affidavit of Adams, ¶¶ 11-12 Exhibit D p. 2. and Appendix pp 162-165, the Position Description for the Chief Financial Officer attached hereto and incorporated herein as Exhibit D-4. Appendix pp. 158-160 is a copy of the former Position

these additional responsibilities. (*See* Appendix pp. 145-147, Affidavit of Adams ¶¶ 7-10, Exhibit D, p. 2.)

41.     Other former responsibilities performed by Ms. Kelly were assumed by the Building Supervisor, James Nash, and Monya Logan, the Minister of Worship and Arts.[12] (*See* Appendix pp. 113-116 Affidavit of Rev. Masters ¶ 12, Exhibit C, p. 3. *See* Appendix pp. 186-189 Affidavit of Washington, ¶ 14, Exhibit G and Appendix pp. 203-204 Minutes of the April 16, 2013, SPPRC Committee attached hereto and incorporated herein as Exhibit G-5.  Ms. Logan became responsible for the calendar and Mr. Nash and Ms. Logan were jointly responsible for room assignments for meetings.  The ministers and Mr. Adams handled day-to-day administrative responsibilities.  (*See* Appendix pp. 113-116, Affidavit of Rev. Masters ¶ 12, Exhibit C p. 3.)

### e.     Release of additional St. Luke employees.

42.     During 2013, St. Luke eliminated three positions.  Ms. Kelly's DOHR position and two summer intern positions.  (*See* Appendix pp.59-62, Affidavit of Rev. Larkin ¶ 5, Exhibit B, p. 2 and Appendix p. 91, Employee Demographics Document attached hereto and incorporated herein as Exhibit B-6.) The staff members who had previously held the summer positions, Allyson Gordon and Ashanti Stuman, were both in their twenties at the time their positions were eliminated.  (*See* Appendix pp. 59-62, Affidavit of Rev. Sharon Larkin ¶5, Exhibit B p. 2 and Appendix p. 91 Employee Demographic Document, Exhibit B-6.)

**V.**
**STATEMENT OF LEGAL ISSUES**

43.     Is St. Luke entitled to summary judgment on Ms. Kelly's sex discrimination claim, when the claim is based upon her supervisor, Rev. Masters' raising his voice during two phone conversations?

44.     Is. St. Luke entitled to summary judgment on Ms. Kelly's sex and age discrimination claims where Ms. Kelly was not treated less favorably than similarly situated co-workers?

45.     Is St. Luke entitled to summary judgment on Ms. Kelly's sex and age discrimination claims because St. Luke had legitimate business reasons, i.e. declining finances and membership, for

---

Description for the Chief Financial Officer; Exhibit D.3.
12 James Nash is seventy-eight (78) years old and serves as the Building Supervisor of St. Luke.  Monya Logan is a fifty two (52) year old female and serves as the Minister of Worship and Arts. *(See* Appendix pp. 59-62 Affidavit of Rev. Larkin ¶ 11, Exhibit B p. 2.)

releasing Ms. Kelly from her employment with St. Luke?

46.      Is St. Luke entitled to summary judgment on Ms. Kelly's sex and age discrimination claims because Ms. Kelly cannot establish that St. Luke's legitimate business reasons for abolishing her position were pretextual since the two new positions, Church Administrator and the Director of Evangelism were created to better serve the needs of the church during 2013?

47.      Is St. Luke entitled to summary judgment on Ms. Kelly's age discrimination claim because Ms. Kelly's reliance on an unnamed statute does not constitute proper evidence to survive a motion for summary judgment?

48.      Is St. Luke entitled to summary judgment on Ms. Kelly's retaliation claim since Ms. Kelly's complaints do not constitute "protected activity"; therefore, she cannot establish a prima facie case of retaliation?

49.      Is St. Luke entitled to summary judgment on Ms. Kelly's ERISA claim since, as a church, it is  not required to comply with the COBRA notification procedures contained in 26 U.S.C.A. § 4980B (3) of the ERISA?

50.      Is St. Luke entitled to summary judgment on Ms. Kelly's due process claim since the courts should not substitute their judgments for ecclesiastical decisions of the Church?

51.      Is St. Luke entitled to summary judgment on Ms. Kelly's due process claim since St. Luke is  not a governmental entity, and therefore not subject to the U.S. Constitution's Due Process Clause?

52.      Is St. Luke entitled to summary judgment regarding Ms. Kelly's fraud and misrepresentation claims since: (1) St. Luke had no duty to keep the elimination of Ms. Kelly's position confidential from the members of the church congregation; (2) the new Church Administrator position  did not assume all of the duties associated with the DOHR position formerly held by Ms. Kelly; (3) the mere presence of a police officer at the time of Ms. Kelly's release from employment is not actionable; and (4) Ms. Kelly did not rely upon any of the above actions to her detriment.

53.      Is St. Luke entitled to summary judgment regarding Ms. Kelly's negligence claim since St. Luke owed no legal duty to: (1) maintain confidentiality regarding the fact that Ms. Kelly's position was abolished and she was released from her employment; (2) discuss Ms. Kelly's potential termination with St. Luke's Personnel Committee, a subcommittee of the SPPRC; and/or (3) speak with Ms. Kelly about the abolishment of her position prior to making the decision to abolish the

position?

54.     Are Rev. Masters and Ms. Washington entitled to summary judgment on Ms. Kelly's defamation claims (per se and per quod) because: (1) the mere presence of a uniformed off-duty police officer at the time of her release from employment does not constitute defamation; (2) the announcements  made during church service and Church Council meeting that Ms. Kelly no longer worked at St. Luke were not defamatory because they were true ; and (3) neither of them referred to Ms. Kelly as "volatile" during a SPPRC meeting?

## VI.
## ARGUMENT AND AUTHORITIES

### A.     Summary Judgment Standard.

Summary judgment is proper when the evidence shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The main purpose of summary judgment is to dispose of factually unsupported claims and defenses. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact. *Id.* at 323. If the moving party meets this burden, the non-moving party must come forward with specific facts that establish the existence of a genuine issue for trial. *ACE Am. Ins. Co. v. Freeport Welding & Fabricating, Inc.*, 699 F.3d 832, 839 (5th Cir. 2012). In deciding whether a factual issue exists, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

However, "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." *Brown v. City of Hous.*, 337 F.3d 539, 541 (5th Cir. 2003). "Where the record taken as a whole could not lead a rational trier of fact to find

for the non-moving party, there is no 'genuine issue for trial.' " *Matsuhita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968).

St. Luke, Rev. Masters and Ms. Washington are entitled to Summary Judgment on Ms. Kelly's claims because Defendants can disprove the essential elements of Ms. Kelly's theories of recovery. Alternatively, there is no evidence to establish all of the essential elements of each of Ms. Kelly's theories of recovery.

**B.      Ms. Kelly Has No Legitimate Sex, Age or Retaliation Claims Pursuant to Texas Commission on Human Rights Act.**

One of the purposes, of the TCHRA is to enforce the policies of Title VII of the Civil Rights Act of 1964 and its subsequent amendments.  Texas Labor Code §21.001.  "The TCHRA was enacted to address the specific evil of discrimination and retaliation in the workplace, as well as to coordinate and conform, with federal anti-discrimination and retaliation laws under Title VII." *City of Waco v. Lopez,* 259 S.W. 3d 147, 153-55(Tex.2008); *Crutcher v. Dallas Independent School Dist.*, 410 S. W. 3d 487 (Tex.App.-Dallas 2013).Therefore, analogous federal statutes and the cases interpreting them guide Texas courts in interpreting the TCHRA.  *Quantum Chemical Corp. v. Toennies*, 47 S. W. 3d 473 (Tex. 2001); *NME Hosps., Inc. v. Rennels.* 994 S. W. 2d 142, 144 (Tex.1999).   While Texas courts consider TCHRA's plain language and state precedent in interpreting the statute, Texas Courts also look to federal law for interpretative guidance to meet the legislative mandate of the TCHRA to provide for the execution of the policies of Title VII. *Crutcher v. Dallas Independent School Dist.,* 410 S. W. 3d 487 (Tex.App.-Dallas 2013).

1.   A Prima Facie Case Under the TCHRA.

To establish a violation of the TCHRA, a plaintiff must show that he or she was (1) a member of the class protected by the Act, (2) qualified for his or her employment position. (3)

terminated by the employer, and (4) treated less favorably than similarly situated members of the opposing class. *AutoZone, Inc. v. Reyes,* 272 S. W. 3d 588 (Tex. 2008). Stated differently, to establish a prima facie case of sex discrimination under Title VII and the TCHRA, a plaintiff must show (1) that she is a member of a protected class, (2) that she was qualified to do her job, (3) that her employment was adversely affected, and (4) that she was replaced by someone outside the protected class. *Westfall v. GTE North Inc.,* 956 F. Supp. 707 (N.D. Tex 1996) citing *McDonnell Douglas Corp v. Green,* 411 U. S. 792, 802 (1973).

Ms. Kelly contends that she was treated differently based upon her sex and age in connection with her compensation, terms, conditions, and privileges of employment. *See* Complaint [Dkt No. 10 ¶ 28.] She also contends that Rev. Masters believed that her salary was too high, which was evidenced by repeated comments to staff regarding her salary and his request to reduce her salary after the budget, inclusive of her salary, was approved. *See* Complaint [Dkt. No. 10, ¶29.] Ms. Kelly further complains that Rev. Masters misrepresented that a reorganization was imminent –terminating her while hiring additional staff, including an individual who assumed substantially all of her former duties. Finally, she contends that she was qualified to perform the "new" job, but was never considered. *See* Complaint [Dkt. No. 10. ¶¶30-31.]

At the outset, Defendants note that Ms. Kelly has failed to even present a prima facie case because she has not identified a similarly situated man who was treated more favorably than she was nor has she claimed she was replaced by someone outside the protected class. These facts are fatal to her sex discrimination claim and the court need consider no further evidence. In an attempt to skirt these fatal defects, Ms. Kelly offers several legally insufficient pieces of evidence and argument. As demonstrated below all are insufficient to defeat Defendants' summary judgment motion.

2. Ms. Kelly cannot establish a Disparate Treatment Claim of Sex Discrimination.

Based on Ms. Kelly's pleadings it appears she has attempted to claim disparate discriminatory treatment.

To establish a prima facie claim under a theory of disparate discriminatory treatment, the plaintiff must establish that an employer intentionally treated its employee worse than others in the workplace based on the employee's age, race, color, religion, sex, or national origin. *See Pacheco v. Mineta*, 448 F.3d 783, 787 (5th Cir. 2006); *Bryan v. McKinsey & Co., Inc.*, 375 F.3d 358, 360 (5th Cir. 2004); *Munoz v. Orr*, 200 F.3d 291, 299 (5th Cir. 2000) (*citing McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973). Once the plaintiff has established a prima facie case of discrimination, "[t]he burden then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Bryan*, 375 F.3d 358, 360 (*quoting McDonnell Douglas,* 411 U.S. 792, 802). This shift applies to the burden of production—not persuasion. *Bryan*, 375 F.3d 358, 360. Stated differently, the burden of persuasion in disparate treatment claims never shifts, therefore, it remains at all times with the plaintiff. *See Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253 (1981).

Once the employer provides sufficient evidence to meet this burden, the plaintiff must rebut the employer's articulated reason by establishing she "was the victim of intentional discrimination by showing that the employer's proffered explanation is unworthy of credence." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 141-42 (2000) ("When a plaintiff alleges disparate treatment, liability depends on whether the protected trait . . . actually motivated the employer's decision.") (internal quotations omitted). The plaintiff can meet this evidentiary burden in one of two ways—(1) by providing evidence of intentional discrimination or (2) evidence establishing "the falsity of the employer's explanation." *Reeves*, 530 U.S. 133 at 1479 ("In other words, '[i]t is not enough to disbelieve the employer; the fact finder must believe the plaintiff's explanation of intentional

discrimination.'") (internal citations omitted); *see also Kanida v. Gulf Coast Med. Pers. LP,* 363 F.3d 568, 574-75 (5th Cir. 2004) ("To prevail, a plaintiff must show actual discriminatory intent; successfully rebutting the defendant's asserted justifications may not itself be sufficient.").

2. A Prima Facie Case for Sex Discrimination Under the TCHRA.

      (i)    Rev. Masters alleged use of a disrespectful tone during two phone conversations does not constitute an adverse employment action.

During Ms. Kelly's deposition, she testified that the sole basis of her sex discrimination claim was two phone calls with Rev. Masters wherein he allegedly used a "disrespectful" tone of voice with her. (*See* Appendix pp. 14, Dep. Kelly Exhibit A p.78.) Kelly stated she did not believe Rev. Masters treated males in the same manner. (*See* Appendix pp. 4-5 and 12-13, Dep. Kelly Exhibit A, pp. 41-42 50-51.) Ms. Kelly admits that the two phone conversations were the sole basis for her sex discrimination claim. (See Appendix pp. 14, Dep. Kelly, Exhibit A, p. 78.) The first time allegedly took place on December 10, 2012, the day before Ms. Kelly took a short medical leave. (*See* Appendix pp. 4-6, Dep. Kelly, Exhibit A pp. 41-43.) The second phone call took place while she was on medical leave when Rev. Masters called about personnel issues regarding other employees. *(See* Appendix pp. 12-13, Dep. Kelly, Exhibit A pp. 50-51.)

In *Mattern v. Eastman Kodak Co.,* 104 F. 3d 702, 707 (5th Cir. 1997), the Court of Appeals for the Fifth Circuit held that "Title VII was designed to address ultimate employment decisions, not to address every decision made by employers that arguably might have some tangential effect upon these ultimate decisions." Plaintiff must show she suffered an "ultimate employment decision", which includes acts such as hiring, granting leave, discharging, promotion, and compensating." *Burlington Northern & Santa Fe Ry. Co. v. White,* 126 S. Ct. 2405 (2006); *Dollis v. Rubin,* 77 F. 3d 777, 781-82 (5th Cir.1995).

As previously stated, despite the allegations contained in Plaintiff's Complaint regarding her

sex and age claims, Ms. Kelly testified that the sole basis for her sex discrimination claims was two

phone calls. (*See* Appendix pp. 14 Dep. Kelly, Exhibit A p.78.) Even accepting Ms. Kelly's claims

as true, Rev. Masters actions of raising his voice during two occasions does not constitute an

ultimate employment decision regarding Ms. Kelly and cannot sustain a claim of sex discrimination.

 Kelly further admitted that when she asked Rev. Masters on December 10, 2012 if "he had a

problem with her", Rev. Masters assured her  that he did not have problems with her or her work

performance[13]. Ms. Kelly admitted that prior to December 10, 2012, Rev. Masters never raised his

voice while speaking to her.  *See* Appendix pp. 7 Dep. Kelly, Exhibit A p. 44.  Further, Kelly

admitted that once she returned from medical leave, Rev. Masters never raised his voice at her

between the date she returned January 19, 2013  and the day of her release from employment

February 1, 2013. (*See* Appendix pp. 7-8, Dep. Kelly, Exhibit A pp. 44-45.)  Further, Ms. Kelly

admitted that she did not mention during either conversation with Rev. Masters that she believed he

was discriminating against her based on her sex; nor did she complain to Rev. Masters' supervisor,

the SPPRC, the Personnel Committee of the SPPRC or the district superintendent of the United

Methodist Church that the alleged "disrespectful tone" used by Rev. Masters constituted sex

discrimination. (*See* Appendix pp. 9-11, Dep. Kelly, Exhibit A pp. 46-48.)

> (ii)    Kelly cannot establish a prima facie case of sex discrimination regarding her
> claim that Rev. Masters' use of a disrespectful tone establishes that she was
> treated differently than similarly situated co-workers.

Ms. Kelly testified that she did not believe that Rev. Masters would have addressed a male in

similar fashion. See Appendix pp. 12-13, Dep. Kelly, Exhibit A pp.50-51. Ms. Kelly has provided

no evidence of this assertion. Ms. Kelly's only allegation of differential treatment is therefore purely

---

13 *See* Appendix pp. 223-224 Evelyn Kelly's Responses to St. Luke "Community" United Methodist Church
Requests for Admissions and her response to Request No. 3 attached hereto and incorporated herein by this reference
as Exhibit I, p.2. Request for Admission No. 3 states: Admit that on December 10,2012, Masters assured you that
he had no problems with Plaintiff or her work performance.  Response: Admit. Exhibit I, p. 2.

speculative and thus cannot create a genuine issue of material fact. *See Douglas v United Servs.*
*Auto. Ass'n.* 79 F. 3d 1415, 1429 (5th Cir. 1996) ("conclusory allegations, speculation and
unsubstantiated assertions are inadequate to satisfy the nonmovant's burden.") (citation omitted). At
most she can say is that she never witnessed Rev. Masters raise his voice at a male co-worker. Other
testimony establishes that Rev. Masters is a mild-mannered man who is not known to raise his voice.
*See* Appendix pp. 59-62 Affidavit of Larkin Exhibit ¶ 9, Exhibit B, p. 2. Ms. Kelly cannot create a
genuine issue of fact without substantive evidence.

      (iii)    Ms. Kelly cannot sustain a claim of sex discrimination based upon the
           allegations in her Complaint.

     Ms. Kelly further contends that she was treated differently based on her sex in connection
with her compensation, terms conditions and privileges of employment based upon the following: (1)
Rev. Masters believed her salary was too high, which was evidenced by his repeated comments to
staff regarding her salary and his request to reduce her salary after the budget inclusive of her salary
was approved; (2) Rev. Masters misrepresented that a reorganization was imminent—terminating
Ms. Kelly while hiring additional staff including another employee who assumed substantially all of
Ms. Kelly's former duties; and (3) Ms. Kelly was qualified to perform the new job, but was never
considered.

     Ms. Kelly's contention that Rev. Masters believed that her salary was too high and told others
his belief is not only not actionable because it does not constitute an ultimate employment decision,
it cannot be substantiated. First, Ms. Kelly admits in her answer to St. Luke's Request for
Admission No. 4, she has no personal knowledge that Rev. Masters ever communicated to St.
Luke's staff that Ms. Kelly "sure made a lot of money". (*See* Appendix pp. 223-224, Kelly's
Responses to St. Luke's Request for Admission No. 4, Exhibit I p. 2.) Ms. Kelly further admitted in
her response to St. Luke's Request for Admission No. 5, that she had no personal knowledge that

Rev. Masters ever discussed a reduction of her salary of $20,000 with Troy Coleman, the Lay Leader for St. Luke. (*See* Appendix pp. 223-224, Kelly's Responses to St. Luke's Request for Admissions, Exhibit I p. 2.)  In fact, Dr. Coleman testified that Rev. Masters never instructed him to reduce Ms. Kelly's salary by $20,000[14].  (*See* Appendix pp. 176-178 Dep. Coleman Exhibit F, pp. 14-16.) Consequently, Ms. Kelly has no evidence to support this claim as part of her sex discrimination claim.

      (iv)    St. Luke had legitimate business reasons for the elimination of Ms. Kelly's position as DOHR; consequently, the reorganization of the duties of the DOHR position, the hiring of additional staff and not conducting an interview of Ms. Kelly do not constitute claims of sex discrimination.

      (a)    Financial Condition and Reorganization of the Church.

Because of the serious decline in church membership and contributions as early as September of 2012, St. Luke looked at a number of areas to reduce costs and expenses, which included possible personnel reductions. (*See* Appendix pp. 145-147, Affidavit of Ollie Adams ¶¶3-5, Exhibit D; p. 1. Appendix pp. 151-156 St. Luke Finance Committee Meeting Minutes, September 20, 2012; St. Luke Budget Reduction Proposals (Revised 9/20/2012); and St. Luke's Budget Proposal, all attached as Exhibit D-2.)

As previously explained, Rev. Masters had a new vision for St. Luke.  As Dr. Coleman testified, part of that plan included reorganization of ministries at St. Luke. (*See* Appendix pp. 176-178 Dep. Coleman, Exhibit F pp. 14-16.) Accordingly, the new vision affected several personnel positions and responsibilities.  Since funds were limited, Rev. Masters knew he had to carefully

---

14 Dr. Coleman presented the following testimony during his deposition: Rev. Masters asked Dr. Coleman to revise several job descriptions to better align the positions with the new organizational structure of the church. The organizational chart was redone and the positions   focused on representing, nurture, outreach, and witness. These primary areas were associated with the major structure of the church at the time. Dr. Coleman did not know if there was a specific conversation regarding reducing Evelyn Kelly's salary, but testified as follows: "I don't think that there was a specific conversation, but I think my counsel would have been if there is a significant change in duties and responsibilities, it could affect pay rates and her pay rate specifically" *See* Appendix, pp. 176-178, Dep. Coleman, Exhibit F, pp.14-16.

utilize financial resources to carry out his vision for the church. In his Staff Revision Proposal, he articulates his plan for more program staff and less administrative staff. (*See Appendix* p. 138 Staff Revision Proposal, Exhibit C-2 p. 1 and Appendix pp. __ Letter from Masters to Washington Exhibit C-4.) Part of the proposal included sharing St. Luke's Nursery/Outreach person with the Breadbasket Ministry which would reduce the budget by $12,000 annually. Further, Rev. Masters proposed revising the job description of the DOHR to reflect the current needs of the church. With the revision of some of the duties, the salary could be reduced by $22,000[15]. These revisions made available $34,000 in the 2013 budget. (*See* Appendix pp. 113-116, Affidavit of Rev. Masters ¶¶ 8-11, Exhibit C, Appendix p. 138 the Staff Revision Proposal, Exhibit C-3. p. 1 and Appendix pp. 140-141 Letter from Masters to Washington Exhibit C-4 pp. 1-2.) Further, the plan was to create a new program staff person—Evangelism Director. This position was a part time position whose responsibilities included outreach and increase in membership.[16] Further, Rev. Masters wanted to add additional sextons on a part-time, rather than full-time basis. Rev. Masters proposed to the SPPRC that $25,000 of the $34,000 be allocated for the Director of Evangelism position and $9,000 be allocated for the sextons. The SPPRC approved the proposal. (*See* Appendix pp.140-141 Letter from Rev. Masters to B. Washington, Exhibit C, pp. 1-2; Appendix pp. 113-116, Affidavit of Rev. Masters ¶¶ 10-11, Exhibit C, pp. 1-2 and Appendix pp. 186-189 Affidavit of Washington ¶¶7-8, Exhibit G, p. 2.) Thus, based upon these legitimate business reasons, Rev. Masters did not misrepresent the reorganizational structure of the Church. The decision was a sound business decision, which should not be disturbed by this Court.

---

15 At the time of Ms. Kelly's release of employment, her salary was $82,000. In2013, the salary for the Church Administrator position was $50,000. Additional funds were retrieved from another budget line item to pay the complete salary of $25,000 for the Director of Evangelism position. *(See* Appendix pp. 113-116, Affidavit of Rev. Masters, ¶ 9 Exhibit C p. 2.)

16 *See* Appendix Affidavit of Rev. Larkin, ¶ 12 and Appendix pp.93-95 Director of Evangelism Job Description attached hereto and incorporated herein as Exhibit B-7, pp. 1-2.

(b.)     Hiring of Additional Staff.

As part of the reorganization process, St. Luke ultimately filled the position of Church Administrator. Rev. Sharon Larkin, a female, filled the position. As described in the subsection d of Factual Background section of this Brief, Rev. Larkin's duties were different from those handled by Ms. Kelly. (*See* Brief, pp.9-11.)  Further, various members of the ministerial staff as well as the Chief Financial Officer assumed some of Ms. Kelly's responsibilities. (*See* Brief, pp. 9-11.)

St. Luke hired Ms. Velda Turnley as the Part-Time Director of Evangelism.  St. Luke also filled several part-time sexton positions. (*See* Appendix pp. 59-62, Affidavit of Rev. Sharon Larkin, ¶ 11 Exhibit B pp. 2-3.)  All of the funds used for these positions were in alignment with the Staff Revised Proposal described above. (*See* Appendix pp. 113-116 Affidavit of Rev. Masters, ¶¶ 9-11 Exhibit C pp. 2-3.)  Ms. Kelly cannot establish that the proposed revisions were not in alignment with the staff revised proposal presented by Rev. Masters.

(c)     Ms. Kelly never applied for the Church Administrator position.

Ms. Kelly's final claim is that she was discriminated against based upon her sex because she was not considered for the Church Administrator position.  Ms. Kelly admitted that she knew the position was posted, but she did not apply. (*See Appendix* pp. 26-27, Dep. Kelly, Exhibit A p. 93-94.) Rev. Masters stated in an open Church Council meeting that Ms. Kelly was welcomed and encouraged to apply for either of the new positions. Ms. Kelly's sister Sharon Bracey attended the meeting.   (*See* Appendix pp. 229-230 Dep. Sharon Bracey ("Bracey") attached hereto and incorporated herein as Exhibit J pp. 37-38.) (*See* Appendix pp. 59-62 Affidavit of Rev. Larkin ¶ 12, Exhibit B p. 3 and Appendix pp. 108-111, St. Luke UMC Minutes of the Church Council Meeting, February 5, 2013 attached hereto and incorporated herein as Exhibit B-10.) (*See* Appendix pp. 113-116 Affidavit of Rev. Masters ¶14, Exhibit C, p. 3.) Ms. Kelly's failure to apply for the new position

forecloses any sex discrimination claim based on St. Luke's failure to hire her for the Church Administrator position.

> (vi)   Ms. Kelly cannot establish pretext for the alleged sex discrimination.

Ms. Kelly cannot establish pretextual reasons for the alleged sex discrimination claim asserted against Rev. Masters. Other than the two conversations with Rev. Masters previously discussed, Ms. Kelly admitted that prior to December 10, 2012, Rev. Masters had never raised his voice with her. Further, Ms. Kelly admitted that after her return to work following her medical leave, Rev. Masters never used a disrespectful tone with her again prior to her departure from St. Luke. (*See* Appendix pp. 7-8 Dep. Kelly, Exhibit A pp. 44-45.) Further, Ms. Kelly has presented no evidence to establish that St. Luke's legitimate business reasons stated above were pretextual.

Although Ms. Kelly contends that since most of her job duties were placed into the Church Administrator position, "her position was not eliminated", the undisputed facts establish otherwise. (*See* Appendix pp. 20-23, Dep. Kelly, Exhibit A pp. 84-87.)   St. Luke distributed Ms. Kelly's duties between several employees. Although the Church Administrator position assumed many of the core human resource duties of the DOHR, as previously stated, it did not assume all of the DOHR duties. St. Luke hired no one to assume all of Ms. Kelly's responsibilities.   (*See* Appendix pp. 59-62 Affidavit of Rev. Larkin ¶ 4, Exhibit B, pp. 1-2 and Appendix pp. 145-147, Affidavit of Ollie Adams ¶¶7-9, Exhibit D p. 2.) Ms. Kelly can produce no evidence to establish that one employee assumed all of her duties.

Based on the foregoing, all of Ms. Kelly's claims of sex discrimination are baseless and not supported by evidence or law. Of most importance, Ms. Kelly fails to establish a prima facie case of sex discrimination, since someone who was within the protected classification, Rev. Larkin, replaced her. Further, Ms. Kelly has woefully failed to establish that any acts allegedly committed by Rev.

Masters constitute "intentional discrimination," a factor that must exist to support her disparate treatment claim. Finally, since most of Ms. Kelly's claims are based upon unsubstantiated factual assertions, assumptions or speculation, all of them must be summarily dismissed.

(v)     Ms. Kelly's age discrimination claims fail as a matter of law.

Ms. Kelly cites the same allegations for her age discrimination claims as for her sex discrimination claims. *See* Complaint [Dkt 10 ¶¶ 27-32, pp. 6-7.] As a result, most of the arguments stated above apply equally to Ms. Kelly's claims of age discrimination.

(a)     Ms. Kelly's age claim is based upon an unnamed statute.

During Ms. Kelly's deposition, she testified that the sole basis for her age discrimination claim was a statute she read on the internet which "required St. Luke to offer her another position at the church, outplacement services and other benefits". Ms. Kelly testified that she would look up the act and give it to Defendant *See* Appendix pp. 15-19, 24, 28, Dep. Kelly, Exhibit A pp. 79-83, 89, 113). Ms. Kelly could not identify the statue during her deposition and has not provided the name of the statute to date.[17]

The TCHR does not contain any provisions which require St. Luke to offer Ms. Kelly another position at the Church, out placement services or other benefits.[18] Accordingly, St. Luke is entitled to summary judgment on her age discrimination claim.

(b)     Ms. Kelly cannot establish *prima facie* case of age discrimination.

In addition, Ms. Kelly's age claim is based upon an alleged violation of the TCHRA. In a

---

17 (*See* Appendix pp. 235-236, Ms. Kelly's Amended Responses and Objections to Defendant St. Luke's Second Request for Interrogatories attached hereto and incorporated herein as Exhibit K, p. 1.) Interrogatory No 22 asked Ms. Kelly to identify the name of the statute specifically described by Ms. Kelly on pages 79-83 of her deposition testimony. Ms. Kelly did not provide any additional statutes other than those outlined in her Second Amended Complaint. *Id.* p. 1. Ms. Kelly's age claim in her Complaint is based upon an alleged violation of the TCHR.

18 Ms. Kelly may have reviewed the provisions of the Worker's Adjustment Retraining Act ("WARN") 29 U.S.C. Chapter 23, 29 U.S.C. §2101(a)(1)(A) which defines an "employer" as any business entity that employs (A) 100 or more employees, excluding part-time employees. St. Luke does not have 100 or more employees; consequently, the provisions of this Act do not apply. (*See* Appendix pp. 59-62 Affidavit of Rev. Larkin ¶ 10, Exhibit B, p. 2.)

---

*Defendants' Brief in Support of Motion for Summary Judgment*                    *Page 24*

true replacement case, an age-discrimination plaintiff relying on the *McDonnell Douglas* burden-shifting framework must show that she was (1) a member of the protected class under the TCHRA, (2) qualified for his or her employment position, (3) terminated by the employer, and (4) replaced by someone younger. *Mission Consol. Independent School Dist. v. Garcia,* 372 S. W. 3d 629,642 (Tex. 2012).

To establish a prima facie case of age discrimination in a termination case, a plaintiff must show: (1) that he was discharged; (2) that he was qualified for the position; (3) that he was within the protected class at the time of the discharge; and (4) that he was (a) replaced by someone outside the class, (b) replaced by someone younger, or (c) otherwise discharged because of his age. *Rifakes v. Citizens Co.,* 968 F. Supp. 315 (N.D. Tex. 1997) citing *Bodenheimer v. PPG Indus., Inc.,* 5 F.3d 955, 957 (5th Cir.1993). In *Rifakes,* Plaintiff brought claims under both the ADEA and the TCHRA. The court granted summary judgment against the plaintiff on his federal ADEA claim. The court held that since the TCHRA correlates state and federal law therefore it must be read consistently with federal precedent and dismissed the TCHRA claim. Accordingly, Plaintiff's TCHRA claim must also be dismissed. *Id.* at 319-320.

*Russo v. Smith Intern, Inc.,* 93 S.W. 3d 428 (Tex. App-Houston [14[th] Dist.]2002) is a state court case, in which, the facts are similar to Ms. Kelly's. In *Russo,* a former employee brought an action under the TCHRA alleging that her demotion and subsequent termination were due to age discrimination. The Court of Appeals found that a workforce reduction due to declining sales and revenue was a legitimate, non-discriminatory reason for the demotion and termination and the plaintiff failed to show that the employer's reasons were pretextual for discrimination.

In this case, Ms. Kelly cannot establish a *prima facie* case of age discrimination since she was not replaced by someone outside the protected class. Rev. Larkin is fifty-one years of age;

consequently, she is within the protected classification (*See* Appendix pp. 59-62 Affidavit of Rev. Larkin ¶ 6, Exhibit B, p. 2. Although Rev. Larkin is younger than Ms. Kelly, without more she cannot sustain a claim of age discrimination[19].

Ms. Kelly has produced no evidence to date to establish that the elimination of her position was based on age. Most of the individuals who assumed her duties are all over the age of 40, i.e.: Rev. Sharon Larkin is fifty-one, Monya Logan is fifty-two, James Nash is seventy-eight and Ollie Adams is fifty-five. Even the new Director of Evangelism Velda Turner is fifty-four. Moreover, the jobs of two employees in their twenties were abolished as well. (*See* Appendix pp. 59-62 Affidavit of Rev. Larkin ¶¶ 5 and 11, Exhibit B pp. 2-3.)

Ms. Kelly has no evidence to link the two phone calls previously discussed to her age claim, or the issues regarding the reduction of her salary etc. As previously stated, her sole basis for her age claim is the reliance on an unnamed statue which provides her alleged protections. Since St. Luke has not been advised of the existence of this unnamed statute and since Ms. Kelly has no other evidence to support a *prima facie* case of age discrimination. Defendants are entitled to summary judgment on Plaintiff's age discrimination claim.

      (c)    St. Luke had legitimate business reasons to abolish the DOHR position, and Ms. Kelly cannot establish pretext.

Further, as previously presented in the sex discrimination analysis portion of this Brief, St. Luke had legitimate business reasons for the abolishment of the DOHR position. Ms. Kelly cannot prove that her replacement assumed all of her prior duties. As has been previously discussed, several

---

19 In the age discrimination context, "an inference that an employment decision was based on illegal discriminatory criterion…cannot be drawn from the replacement of one worker with another worker insignificantly younger." *O'Connor v. Consolidated Caterers Corp.*, 517 U.S. 308, 312-13, 116 S. Ct. 1307, 1310 (1996). To establish a prima facie case of age discrimination, the age of the person hired to replace the plaintiff must be significantly younger than the plaintiff. The fact that the person is in the protected class has been replaced by another person in the protected class is irrelevant, so long as he has "lost out" because of his age. *Id.* at 312.

persons assumed portions of Ms. Kelly's duties.  Ms. Kelly cannot cite any improper references made by Rev. Masters regarding her age or any other forms of direct evidence to establish intentional discrimination; consequently, her age claim must be dismissed.

Further, Ms. Kelly cannot establish that the vision of Rev. Masters to expand the program staff to incorporate the tenets of Now, Outreach and Witness serve as a "pretextual" basis for the elimination of the DOHR position.  (*See* Appendix pp. 113-116 Affidavit of Rev. Masters ¶ 5, Exhibit C p. 2.) Consequently, Defendants are entitled to summary judgment on Ms. Kelly's claims of age discrimination.

(vi)    Ms. Kelly cannot establish a *prima facie* case of retaliation.

In her Complaint Ms. Kelly, for the first time,  includes a claim of retaliation.  *See* Complaint [Dkt No. 10 ¶¶ 34-35, pp. 7-8.]

In a retaliation case, the plaintiff must show that (1) he is engaged in a protected activity, (2) an adverse employment action occurred, and (3) a causal link existed between the protected activity and the adverse action.  *Pineda v. United Parcel Service, Inc.* 360 F. 3d 483 (5th Cir. 2004).  *See* also *Crutcher v. Dallas Independent School Dist.,* 410 S. W. 3d 487 (Tex.App.-Dallas 2013) citing *Burlington N. Santa Fe Ry v. White,* 548 U.S. 53, 67-68 (2006); *Pineda v. United Parcel Service, Inc.,* 360 F. 3d 483 (5th Cir. 2004).

(a.)    Ms. Kelly's Retaliation Claim Fails as a Matter of Law.

Ms. Kelly contends, "Defendant instituted a campaign of retaliation, which included Kelly's termination for opposing and complaining of unlawful discriminatory practices.  Kelly asserts that St. Luke discriminated against her in violation of TCHR for engaging in protected activity; thereafter, Kelly experienced an adverse employment action when her position was eliminated, a causal link existed between the protected activity and the adverse employment action.  *See* Complaint [Dkt. No.

10) ¶34.]

Ms. Kelly provides no specific facts in this section of her Complaint to support her claim. *See* Complaint [Dkt. No 10¶ 34.] Assuming that Ms. Kelly is relying on the two conversations she held with Rev. Masters to establish the "protected activity" basis of her retaliation claim, she cannot establish a *prima facie* case of retaliation.

(b.)    Ms. Kelly cannot establish she engaged in protected activity.

As previously stated an employee has engaged in a "protected activity" when she opposes any............unlawful employment practice" within the definition of 42 U.S.C. §2000e, or "has made a charge, testified, assisted or participated in any manner in an investigation, proceeding or hearing involving 42 U.S.C.§ 2000 e. *Baker,* 430 F. 750, 755 (5th Cir. 2005) (citing 42 U.S.C. § 2000 e – 3)[20]

Ms. Kelly's only possible claim of "protected activity", which St. Luke denies constitutes "protected activity", is when she held the two phone conversations with Rev. Masters and he used the "disrespectful tone". Ms. Kelly admits that when she asked Rev. Masters if "he had a problem with her", he said "no". (*See* Appendix pp. 3-6 Dep. Kelly, Exhibit A pp. 40-43. This simple question does not denote a complaint of sex or age discrimination.

Kelly admits that once she returned from medical leave Rev. Masters did not raise his voice at her between the times of her return and her release date from employment. (*See* Appendix pp. 7-8 Dep. Kelly, Exhibit A pp. 44-45.) Kelly further admitted that she never complained to Rev. Masters' supervisor, the SPPRC, the Personnel Committee of the SPRRC, or the district superintendent of the

---

20 "It shall be an unlawful employment practice for an employer: (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2.

United Methodist Church that she believed Rev. Masters' conduct constituted discrimination. (*See* Appendix pp. __ Dep. Kelly, Exhibit A pp. 46-48.) Accordingly, Ms. Kelly cannot establish that she participated in any "protected activity" as it relates to her terms and conditions of employment prior to her release of employment by St. Luke.

   (c)   Ms. Kelly cannot satisfy the second element of a *prima facie* case of retaliation.

   Alternatively, if the Court accepts Ms. Kelly's proposition that her participation in the two phone call constitutes "protected activity," St. Luke contends that Ms. Kelly cannot establish that second prong of a *prima facie* case of retaliation *i.e.,*- she was subjected to an action that a reasonable employee would have found materially adverse.

   Even if Rev. Masters raised his voice during the two phone conversations, nothing happened to Ms. Kelly as a result the conversations. Ms. Kelly still went out on medical leave as planned. After the December 10, 2012 conversation, when Rev. Masters called Ms. Kelly about other personnel issues while she was out on medical leave, Ms. Kelly was not terminated while she was on medical leave. She returned to St. Luke without incident.

   Further, Ms. Kelly cannot establish a causal connection between the two phone conversations and her release from employment. Ms. Kelly has no evidence to link the two conversations with Rev. Masters to the decision to abolish the DOHR position by the SPPRC. As previously stated, Ms. Kelly returned from medical leave, Rev. Masters never raised his voice again. Since Ms. Kelly never complained to anyone that she believed this incident constituted some form of discrimination there is no causal link to the abolishment of the DOHR position. Ms. Kelly cannot establish that the SPPRC knew anything about the issue regarding two phone conversations since she never raised the issue with them. (*See* Appendix pp. 9-11, Dep. Kelly, Exhibit A pp. 46-48. Thus, since Ms. Kelly cannot establish that there was a link between the "protected activity" and the ultimate abolishment of her

position; her retaliation claim should be summarily dismissed.

**C.     Ms. Kelly's claims regarding St. Luke's violations of ERISA/COBRA fail since St. Luke is a church.**

Ms. Kelly further alleges St. Luke violated provisions of ERISA/COBRA since St. Luke failed to give her notice regarding her COBRA benefits.  *See* Complaint [Dkt. No. ¶ 36.]  Even assuming this allegation is true, Ms. Kelly's claim must fail as a matter of law.

St. Luke is a tax-exempt organization[21] under Section 501 of the Internal Revenue Code and provides its employees a group benefit plan defined by Section 414(e) of the Internal Revenue Code. This plan is called the General Board of Pension and Health Benefits of the United Methodist Church. (*See* Appendix pp. 59-62 Affidavit of Rev. Larkin, ¶ 8 Exhibit B p.2.)  Ms. Kelly was a participant in the Plan.  *See* Appendix pp. 59-62, Affidavit of Rev. Larkin, ¶ 12, Exhibit B, p. 3 and Appendix pp. 105-106 Kelly's Insurance paperwork from St. Luke attached hereto and incorporated herein as Exhibit B-9, pp. 1-2.

COBRA does not apply to group health plans of church employers.[22]  Specifically, 26 U.S.C.A. § 4980B entitled "Failure to satisfy continuation coverage requirements of group health plans" states:

This section shall not apply to--
   (1) any failure of a group health plan to meet the requirements of subsection (f) with respect to any qualified beneficiary if the qualifying event with respect to such beneficiary occurred during the calendar year immediately following a calendar year during which all

---

21 (*See* Appendix pp. 59-62 Affidavit of Rev. Larkin ¶ 7, Exhibit B, p. 2 and Appendix pp. 97-103 St. Luke Articles of Incorporation attached hereto and incorporated herein as Exhibit B-8.)

22 HR Series Policies and Practices, COBRA Coverage, 3 Policies and Practices § 184:3 ("COBRA continuation coverage applies to the group health plans of all employers except the following: churches ... employers who normally employ fewer than 20 employees during a typical business day during the preceding calendar year.") (*citing* I.R.C. § 414(e) (provides definition of a "church plan")).  *See also,* United States Department of Labor, COBRA Continuation Health Coverage, *available at* http://www.dol.gov/ebsa//faqs/faq_compliance_cobra.html (last visited May 1, 2013). ("The law [COBRA] does not apply, however, to plans sponsored by the Federal Government *or by churches* and certain church-related organizations.")(emphasis added).

employers maintaining such plan normally employed fewer than 20 employees on a typical business day,

(2)  any governmental plan (within the meaning of section 414(d)), or

(3)  any *church* plan (within the meaning of section 414(e)).

Under 26 U.S.C.A. § 414(e), a "church plan" is defined as "a plan established and maintained . . . for its employees (or their beneficiaries) by a church or by a convention or association of churches which is exempt from tax under section 501." Certain plans are excluded, for instance, "plans which [are] established and maintained primarily for the benefit of employees (or their beneficiaries) of such church or convention or association of churches who are employed in connection with one or more unrelated trades or businesses.[23]

St. Luke's medical plan is administered by the United Methodist Church, as such it falls within the definition described above. (*See* Appendix, pp. 59-62, Affidavit of Rev. Larkin, ¶ 8 Exhibit B, p. 2.) As a result, Ms. Kelly's violation of the ERISA/COBRA statute must fail as a matter of law.

**D.   Ms. Kelly's Due Process claims fail since the court cannot contravene ecclesiastical decisions made by St. Luke.**

St. Luke contends that  Ms. Kelly's due process claims fail because under the First Amendment to the U.S. Constitution  St. Luke, as a Church, has the power to determine within its religious boundaries how it will establish its organizational structure, dispense its ministries and programs all without interference from governmental entities such as the courts.  In 2012, the U. S. Supreme Court explored the question of the proper boundary between church activity and court intervention.  *See Hosanna Tabor-Evangelical Lutheran Church and School v Equal Employment Opportunity Commission* 132 S. Ct. 694 (2012).  Although the holding of that case is not dispositive of the issues presented here, cases cited therein are applicable to Ms Kelly's claim.

---

[23] 26 U.S.C.A. § 414(e).

(i). The Court should not substitute its judgment for questions of faith, discipline, or ecclesiastical rule, custom, or law which have been decided by the highest church judicatories.

In *Serbian Easter Orthodox Diocese for United States and Canada v. Milivojevich*, 426 U.S. 696, 96 St. Ct. 2372, 49 L. Ed. 2d 151 (1976), a case involving a dispute over control of the American-Canadian Diocese of the Serbian Orthodox Church, including its property and assets, the Church had removed a bishop of the American-Canadian Diocese because of his defiance of the church hierarchy. Following his removal, the bishop brought a civil action in state court challenging the Church's decision, and the Illinois Supreme Court "purported in effect to reinstate [him] as Diocesan Bishop," on the ground that the proceeding resulting in his removal failed to comply with church laws and regulations, *Id.*, at 708, 96 S.Ct.2372.

Reversing the judgment, the Supreme Court explained that the First Amendment "permit{s} hierarchical religious organizations to establish their own rules and regulations for internal discipline and government, and to create tribunals for adjudicating disputes over these matters."*Id.*, at 724, 96 S. Ct. 2372. When ecclesiastical tribunals decide such disputes, we further explained, "the Constitution requires that civil courts accept their decisions as binding on them." *Id.*, at 725, 96 S. Ct. 2372. We thus held that by inquiring into whether the Church had followed its own procedures, the State Supreme Court had "unconstitutionally undertaken the resolution of quintessentially religious controversies whose resolution the First Amendment commits exclusively to the highest ecclesiastical tribunals "of the Church. *Id.*, at 720, 96 S. Ct. 2371. *See also Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in North America,* 344 U. S. 94, 116, 73 S. Ct. 143, 97 L. Ed. 120 (1952) for similar decision.

In this instant case, Ms. Kelly complains that St. Luke violated her due process rights because the church did not follow policies of the United Methodist Church or St. Luke's Personnel

Practice Manual. *See* Complaint [Dkt. No. 10 ¶ 38].  St. Luke contends the decision of Rev. Masters to implement his new vision for the church through the NOW structure and the Radical Hospitality program and the ultimate personnel decisions resulting from the implementation of these ecclesiastical decisions should not be challenged by this court based upon the principles stated above.  The senior pastor of St. Luke has the authority to determine how best to lead his flock.  If this Court interferes with his attempts to improve the financial position of St. Luke via redistributing finances to accommodate new church goals, this Court will in essence substitute its judgment for that of an ecclesiastical entity in violation of the above-stated principles.  The United Methodist Church places these duties upon the local pastors and the local congregation.  As a result, St. Luke contends that the Supreme Court has held such decisions as those made by Rev. Masters and the SPPRC should not be disturbed by this court.

(ii) Alternatively, Ms. Kelly's due process claims fail since St. Luke is not a governmental entity.

The Fourteenth Amendment prohibits the states from denying federal constitutional rights and guarantees due process of law.  It applies to acts of the states and not to acts of private persons or entities.  *Rendell-Baker v. Kohn*, 457 U. S. 830, 837 (1982) (holding that former teachers' of non-profit privately operated school action failed for lack of "state action").  The principle that private action is immune from the restrictions of the Fourteenth Amendment is well- established and easily stated.  *Jackson v. Metropolitan Edison Co.,* 419 U. S. 345, 349-50 (1974).  Because the Fourteenth Amendments is directed at States, it can be violated only by conduct that may be fairly characterized as state action.  *Lugar v. Edmondson Oil Co, Inc.,* 457 U. S. 9223 (1982).  Accordingly, all of Ms Kelly's due process violations fail because St. Luke is not a governmental entity.

Notwithstanding the foregoing, Ms. Kelly contends that her "due process" rights were violated because St. Luke did not comply with mandatory procedures set forth by United Methodist

Church Policies and St. Luke Policies. *See* Complaint [Dkt. No. 10 ¶ 38.] As stated above, because St. Luke is a church, not a governmental entity this claim fails as a matter of law. However, even if the court considers her claim there is no factual basis to support it. During Ms. Kelly's deposition, she complains that her treatment conflicts with the mission of the church which is to treat members with grace and compassion. *See* Appendix, pp. 34-36 Dep. Kelly, Exhibit A, pp. 124-126. Ms. Kelly further complains that she should have been offered the Church Administrator position. (*See* Appendix pp. 29-31 Dep. Kelly, Exhibit A pp.118-120.) However, she admits that there is no provision in the Employee Handbook which required St. Luke to offer her another position. (*See* Appendix pp. 32-33, Dep. Kelly, Exhibit A pp.121-122.)

Ms. Kelly also contends that her termination was in violation of St. Luke's discipline policy contained in the Employee Handbook. Since Ms. Kelly was not terminated for cause, these provisions do not apply. Ms. Kelly's position was abolished which caused her to be released from her employment. (*See* Appendix pp. 88-89, Letter of Termination Exhibit B-5 p. 1.) Further, Ms. Kelly admitted that St. Luke's Employee Handbook does not contain any provisions or procedures regarding job elimination. (*See* Appendix pp. 52, Dep. Kelly, Exhibit A p. 168.)[24]

---

[24] St Luke anticipates that Ms. Kelly will also contend that St. Luke violated her "due process" rights because her termination was not approved by the Church Council. According to the Book of Discipline of the United Methodist Church, the duties and responsibilities of the SPPRC are contained in Section 258.2. The duties which relate to hiring and termination of non-appointed personnel are found in Section 258.2 (g) (12) of the Book of Discipline which states in pertinent part: To recommend to the church council, after consultation with the pastor the professional and other staff positions (whether employee or contract) needed to carry out the work of the church or charge. The committee and the pastor shall recommend to the church council a written statement of policy and procedures regarding the process for hiring, contracting, evaluating, promoting, retiring, and dismissing staff personnel who are not subject to Episcopal appointment as ordained clergy. **Until such a policy has been adopted**, the committee and the pastor shall have the authority to hire, contract, evaluate, promote, retire and dismiss non appointed personnel (emphasis added)......See Appendix pp. 81, Book of Discipline, Exhibit B-3 pp. 183. In this instance, the Personnel Practices Manual for St. Luke was never adopted by the Church Council. The Employee Handbook has been in a development process for a number of years and has never been presented to the Church Council for adoption. *See* Appendix pp. 186-189, Affidavit of Bernice Washington ¶ 15, Exhibit G p. 3. *See* Appendix pp 2438-240 Affidavit of Troy Coleman, ¶¶3-5 attached hereto and incorporated herein as Exhibit L, p. 2. Since the Church Council has never adopted the Handbook, the Pastor and the SPPRC had the authority during Ms. Kelly's tenure with St. Luke to hire and dismiss non-appointed personnel. The elimination of the DOHR position came within the authority of the SPPRC; consequently, the ultimate decision to release Ms. Kelly from employment because of the abolishment of her position was not contrary to any policy or procedure of St.

### E.    Ms. Kelly's Claims of Fraud and Misrepresentation Fail as a Matter of Law.

Ms. Kelly contends that St. Luke, through its agents, committed fraud and misrepresentation by the following : (1) made material misrepresentations regarding the elimination of her position; (2) when the statements were made, the Defendant knew them to be false or made the statements recklessly without any knowledge of their truth and (3) the representations were made with the intention that they should be acted on by Kelly. Ms. Kelly further complains that (1) the information provided during the course of business was false; (2) St. Luke did not exercise reasonable care or competence in obtaining or communicating the information and (3) Ms. Kelly justifiably relied on the information and suffered damages as a result thereof.   *See* Complaint [Dkt. No. 10 ¶¶ 41-42.]

During her deposition, Ms. Kelly based her misrepresentation and fraud claims upon three actions committed by Defendants.  First, Ms. Kelly contends that Rev. Masters called her the day before her termination and asked her to come to his office to discuss the church's calendar.  When she arrived at his office on February 1, 2013, there was no discussion regarding the church calendar. Ms. Kelly contends that if she had known that the meeting was about her release from employment, "she would have asked to meet privately where there was not a lot of people[25]." (*See* Appendix p. 57, Kelly Dep., Exhibit A, p. 209.)  During that meeting she was dismissed.

Second, Ms. Kelly contends that the elimination of the DOHR position and the creation of the Church Administrator position which assumed most of the DOHR duties constitutes misrepresentation and fraud because the positions were substantially similar. *See* Appendix pp. __ Dep. Kelly, Exhibit A pp. 152-154.

Third.  Ms. Kelly complains that Rev. Masters and Ms. Washington publically informed

---

Luke or the Book of Discipline.  As a result, Ms. Kelly's due process claim must be summarily dismissed.
25 When Ms. Kelly was informed by Rev. Masters and Ms. Washington that her position was abolished, hey were alone in Rev. Masters's office. (*See* Appendix pp. 186-189, Affidavit of Bernice Washington ¶ 10 Exhibit G, pp. 2-3.

members of the congregation that her position was eliminated and she was no longer serving in the DOHR position. Although Ms. Kelly's position was eliminated and she was released from her employment, Ms. Kelly claims that even this basic truthful and factual information should not have been shared with members of the public because it was confidential and therefore its disclosure constituted fraud or misrepresentation.. (*See* Appendix pp. 37-39, Dep. Kelly, Exhibit A pp.131-133.)

Fourth, the presence of the off-duty police officer at the time of her dismissal neither constitutes a misrepresentation nor implies that she committed a criminal act.

Under Texas law, common-law fraud and misrepresentation are the same cause of action. *See Snyder Commens, L.P. v. Magana*, 142 S.W.3d 295, 298 (Tex. 2004). A cause of action of fraud "requires a material misrepresentation, which was false, and which was either known to be false when made or was asserted without knowledge of its truth which was intended to be acted upon, which was relied upon, and which caused injury." *Formosa Plastics Corp v. Presido Eng'rs and Contractors, Inc.* 960 S.W.2d 41, 47-48 (internal quotations omitted). "Proof that a party relied to its detriment on an alleged misrepresentation is an essential element of a fraud claim." *Hassee v. Glazner,* 62 S.W. 3d 785, 798 (Tex. 2001).

Based upon the above statement of law, none of Ms. Kelly's claims can sustain a claim of misrepresentation or fraud. Even if Rev. Masters' stated reasons for the meeting February 1, 2013, was not truthful, no injury was caused to Ms. Kelly by her appearance at the meeting. She was told that she was going to be released that day, but there were no actions Ms. Kelly took in reliance upon the invitation to meet which caused her injury. The decision to abolish her position had already been made prior to her arrival, so she could have taken no action to forestall this result. She simply

received the bad news during the meeting.

Second, Ms. Kelly's contention that the creation of the Church Administrator's position constitutes misrepresentation and fraud because many of the duties she performed are tasks the Church Administrator performs is wrong. As previously stated, all the DOHR duties were not performed by the Church Administrator. When a comparison is made between the two position descriptions attached as Appendix pp. 72-73 DOHR job description Exhibit, B-2 and Appendix pp. 84-86, Church Administrator job description Exhibit B-4, it is clear that the following duties are no longer required to be performed by the Church Administrator: (1) the development of policies or procedures; (2) the review or approval of strategic plans for the Finance Committee; (3) attendance at meetings of the Church Council, Executive Committee, Finance Committee, Trustees and Building Committee and (4) the approval of budgets. (*See* Appendix pp. 59-62, Affidavit of Rev. Larkin, ¶ 4 Exhibit B, pp. 1-2.) In addition, some of the duties were assumed by the Chief Financial Officer, Ollie Adams. Mr. Adams now attends the Finance Committee meetings instead of Rev. Larkin and is responsible for the vendor relations program for the church. *See* Appendix pp. 145-147, Affidavit of Adams ¶¶ 7-9, Exhibit D p. 2. Further, the salary was reduced to reflect a decrease for services provided by the position. *See* Appendix pp. 113-116 Affidavit of Rev. Henry Masters ¶ 9, Exhibit C p. 2.

St. Luke contends that even members of the congregation have the right to know who its employees are. At some point, members would notice that Ms. Kelly was no longer serving as the DOHR and would inquire about her whereabouts. The announcements made simply stated that the DOHR position was abolished and Ms. Kelly was released as the DOHR. Ms. Kelly cannot deny that these statements were true. (*See* Appendix, pp. 88-89 Letter of Termination, Exhibit B-5 p.1.) Further, neither Ms. Washington nor Rev. Masters ever made any comments about Ms. Kelly's

salary, evaluations or any other personnel information.  Nothing stated therefore constituted acts of fraud or misrepresentation.

Finally, the issue with the presence of the police officer cannot possibly sustain a claim of misrepresentation and fraud since his mere presence could not possibly constitute a "statement" about Ms. Kelly upon which she relied to her detriment.   Thus, for all the foregoing reasons, Ms. Kelly's claims of fraud and misrepresentation should be dismissed by this court.

### F.    Ms. Kelly's Negligence Claims Fail as a Matter of Law since Ms. Kelly cannot establish a Prima Facie Case of Negligence against St. Luke.

Ms. Kelly contends that St. Luke's actions were negligent because St. Luke owed a duty of care to follow church policy and St. Luke breached that duty when there was a variation from church policies.  *See* Complaint [Dkt No. 10 ¶ 45.]

Ms. Kelly's negligence claims relate back to the church's discussion of her employment with the congregation and mentioning her name in public.  Further, she contends that there was a violation of St. Luke's handbook to maintain "confidentiality" regarding her employment issues.  She also contends that her termination should have been discussed with the Personnel Committee of the church as well as the SPPRC and she was never given an opportunity to respond to the termination. *(See* Appendix pp. 47-49, Dep. Kelly, Exhibit A pp.160-161, 163 these claims are meritless.)

The elements of negligence are: (1) the existence of a legal duty owed by one person to another to protect the latter against injury; (2) a breach of that duty; (3) damages proximately resulting from the breach.  *See Firestone Steel Products Co. vs. Barajas,* 927 S.W. 2d 608, 613 (Tex. 1996).

Duty, the threshold element, is a question of law for the Court to decide based on the facts surrounding the occurrence in question.  *See Joseph E. Seagram & Sons, Inc. v. McGuire,* 814 S.W. 2d 385, 387 (Tex. 1991).  Generally, one's duty is to observe a standard of care (*e.g.,* ordinary care

while driving) or to take some affirmative action (*e.g.* to correct or warn of a dangerous condition one creates). That standard of care in negligence cases is typically that of "ordinary care" or that which a person of ordinary prudence would or would not have done under the same or similar circumstances. *See Calvin v. Red Steel Co.,* 682 S.W. 2d 243, 245 (Tex. 1984).

In this case, Ms. Kelly cannot establish a negligence claim because St. Luke breached no legal duty owed her. First, Ms. Kelly complains that she did not have an opportunity to discuss her termination prior to her release or that the termination should have been presented to the Personnel Committee of the SPPRC. There is no authority that St. Luke's policies impose such legal duties. There is no Church policy or document which states that she has a right to discuss the abolishment of her position  prior to her release from employment. No such provisions exist within the Book of Discipline or the St. Luke Personnel Practices Manual.

Further, although Ms. Kelly contends that the issue of the abolishment of the DOHR position should have been presented to St. Luke's Personnel Committee before her termination, there is no church policy or provision from the Book of Discipline which requires such an action for job elimination. Ms. Kelly admits that the Personnel Committee is a subcommittee of the SPPRC Committee. *(See* Appendix p. 50 Kelly's Dep., Exhibit A p. 165.) The decision to abolish the DOHR position was made by the SPPRC. She further admits that St. Luke's Employee Handbook has no provisions or procedures regarding job elimination. *See* Appendix p. 50 Kelly's Dep., Exhibit A p. 165. The Handbook only requires a recommendation of the Personnel Committee if the employee is being terminated for cause. (*See* Appendix pp. 67-68, St. Luke Personnel Practices Manual Section 8.0 Discipline and Redress Procedures, Subsection 8.2 4. Dismissal/Termination, Exhibit B-1 pp. 27-28.)[26] Ms. Kelly was not terminated for cause. (*See* Appendix pp. 88-89 Letter

---

[26] Section 8.2.4 of the Personnel Practices Manual states in pertinent part.....if an incident or offense for which an employee has been warned continues after proper review and proper counseling, the church may terminate

of Termination, Exhibit B-5 pp. 1-2.) Thus, no church document imposes upon St. Luke any duty to present the issue regarding the job abolishment to the Personnel Committee prior to taking action. Further, there are no provisions in the St. Luke Personnel Practices Manual nor the Book of Discipline which require anyone from the SPPRC or any other agent of St. Luke to discuss the potential abolishment of the DOHR position with Ms. Kelly before a decision was made by the SPPRC.

Ms. Kelly also contends that St. Luke breached its legal duty of "confidentiality" when Rev. Masters or Ms. Washington stated during Church service and a Church Council meeting that due to reorganization, her position was eliminated and as a result, she was released from her position. There is nothing "confidential" about these facts. These statements were not only public knowledge, they had been previously reported to church staff. These statements were also true, e.g., reorganization had taken place and her position was abolished.[27] Rev. Masters and Ms. Washington did not provide "confidential" information about her salary, performance reviews, treatment of other employees, etc.

Ms. Kelly was not present at Church when the announcements were made. Accordingly the statements were hearsay. It was, however, Ms. Kelly's understanding that the only things said during church service was that her name was called and she was no longer at the church. *(See* Appendix pp. 40-43 Dep. Kelly, Exhibit A pp. 136-139). Church members needed to know that the highest administrative position in the Church was abolished and what had happened with the employee. St.

---

employment. Termination will be administered upon recommendation of the supervisor, in cooperation with the Personnel Committee, the Pastor-Parish Relations Committee and the Church Council. Termination procedures will be documented to include complete details of the circumstances leading to termination. Written copies will go into the employee's personnel file and to the employee *(See* Appendix pp 67-68, Excerpts from the St. Luke Personnel Practices Manual, Exhibit B-1. pp 27-28.).

27 The reorganization for St. Luke was previously discussed in Section c of the Factual Background of this Brief, pp.7-9. The reorganization consisted of the abolishment of the DOHR position and the creation of the Church Administrator and the Director of Evangelism positions.

Luke did not breach any legal duty owed to Ms. Kelly. Consequently, Ms. Kelly; cannot satisfy the first two prongs of a *prima facie* case of negligence.

Further, Ms. Kelly cannot establish damages for the alleged negligent conduct. Ms. Kelly's position was abolished. Any of the alleged acts of negligence (the statements made during the church council and church service meetings) would not have affected the ultimate outcome of her dismissal by St. Luke. The decision to terminate Ms. Kelly and the act of releasing Ms. Kelly from her employment had already occurred by the time the statements were made to the church. Thus, for these reasons, Ms. Kelly's cannot establish any damages for the alleged negligent acts of St. Luke. Therefore, her entire negligence claim is meritless.

### G.   Ms. Kelly's Defamation (Per se and Per Quod) Claims must Fail Since Any Statements Made by Rev. Masters and Ms. Washington Were True.

Ms. Kelly contends that Rev. Masters and Ms. Washington made oral statements, which were false, constituted defamation per se and per quod as the statements imputed a crime and injured Ms. Kelly's business and professional reputation. Specifically, she claims Rev. Masters and Ms. Washington published a statement of fact regarding Ms. Kelly, i.e. that the position she held had been eliminated and that she no longer worked at the church, and arranged for an off-duty Dallas police officer to escort her to her office to retrieve her belongings and escort her from the church. She further contends that Rev. Masters' and Mrs. Washington's actions were malicious, negligent, and meant to impeach Ms. Kelly's honesty, integrity, virtue, and reputation. *See* Complaint [Dkt. No. 10 ¶¶48-51.]

A defamation claim requires a plaintiff to establish: (1) the defendant published a statement of fact; (2) the statement was defamatory; (3) the statement was false; (4) the defendant acted negligently in publishing the false and defamatory statement; and (5) the plaintiff suffered damages

as a result. *See Brown v. Sweet & Crawford of Tex., Inc.,* 178 S. W. 3d 373, 382 (Tex. App-Houston 2005, no pet) (citing *WFAA-TV, Inc. v. McLemore,* 978 S. W. 2d 568, 571 (Tex.1998)).

1. Ms. Kelly's claims of Defamation should be Dismissed since Comments made by Defendants were True.

Rev. Masters and Ms. Washington did not make any defamatory statements regarding Ms. Kelly. When these individuals talked about the elimination of Ms. Kelly's position, they both stated because of the reorganization process, Ms. Kelly's position was eliminated and she was released from her employment by the church. These statements were true[28]. Further, Ms. Kelly admits she does not know any other "statements" made by Rev. Masters or Ms. Washington. (*See* Appendix pp. 53-56 Dep. Kelly Exhibit A pp. 169-172.)

Even though the statements were true, Ms. Kelly argues the statements were defamatory for the following reasons. She contends that since Rev. Masters and Ms. Washington discussed her departure from the church during service on a Sunday morning and during a Church Council meeting on February 5, 2013, their actions violated St. Luke's Employee Handbook which provides that employee matters are "confidential".[29] (*See* Appendix pp. 51-56, Dep. Kelly, Exhibit A pp. 167-172.) Despite a limited discussion regarding the reorganization process and the elimination of her position with the congregation and church leaders on these occasions, the actions of Rev. Masters and Ms. Washington did not violate the confidentiality provision of the handbook. The elimination of the

---

28 Sharon Bracey is Ms. Kelly's sister. She was present during the 8:00 am service on February 3, 2013. Ms. Bracey testified that Ms. Washington made the following statement: " the church was moving in a new direction of radical hospitality and in that vein, they had released the director of operations, Evelyn Kelly….." "She said something about restructuring". (*See* Appendix pp. 227-228 Dep. Bracey, Exhibit J, pp. 19-20.) Ms. Bracey also testified that there was no mention of the police escort during the service. (*See* Appendix p. 231 Dep. Bracey, Exhibit J p. 40.) Ms. Bracey testified that during the church council meeting on February 5, 2013, someone asked a question about a police escort, but the topic was not discussed deeply during the church council meeting. (*See* Appendix pp. 232-233, Dep.Bracey, Exhibit J, pp. 62-63.)
29 Section 4.11 of St. Luke's Personnel Practices Manual states as follows: Any information received by an employee or applicant on a confidential basis is to be maintained in confidence. Violators are subject to immediate dismissal. (*See* Appendix 65, Excerpts from the St. Luke Personnel Practices Manual, Exhibit B-1. p. 15).

position and Ms. Kelly's release of employment are not confidential information. Further, the statements made by Rev. Masters and Ms. Washington were true.

       2.     The mere Presence of a Police Officer does not Constitute Defamation.

Ms. Kelly complains that the mere presence of a Dallas police officer constitutes "defamation". She contends that "his presence implied that she was a criminal and did something wrong". (*See* Appendix pp. 51-55, Kelly Dep., Exhibit A pp. 167-171.) Binding authority from the 5th Circuit Court of Appeals holds that the presence of security personnel to escort employees from the premises does not constitute defamation. *See Bagby v. General Motors Corp.,* at 6 F.2d 919( 5th Cir. 1992), where the court held that standing  alone, the mere escorting of suspended workers out of the plant is not defamatory or indicative of malice.

       3.     A description of Ms. Kelly as "volatile" during a SPPRC meeting does not constitute defamation.

Ms. Kelly complains that during a SPPRC meeting and possibly during the Church Council meeting, she was described as "volatile" and this statement constitutes defamation per se and per quod. There is no evidence Rev. Masters or Ms. Washington made these statements. Based on the record the term "volatile" was used during the closed Committee meeting held on February 12, 2013. Ms. Washington reported that some members of the SPPRC had previously described Ms. Kelly as "volatile" This occurred well after the decision to terminate Ms. Kelly had already been made and the committee members responsible for approving the reorganization were being debriefed. (*See* Appendix pp. 189-189, Affidavit of Bernice Washington, ¶ 13, Exhibit G, p. 3 and Appendix SPPRC Minutes dated February 12, 2013 attached hereto and incorporated herein as Exhibit G-6, pp.  2-3.) Accordingly, the statement had no effect on her termination.

Even if the court finds that use of the term "volatile" is defamatory, because neither Rev. Masters nor Ms. Washington referred to Ms. Kelly as "volatile" they cannot be held personally liable. In this case,   Ms. Washington did not make the comment during the church service meeting or the Church Council meeting and even when Ms. Washington reported it in a subsequent SPPRC meeting to members of the Committee, it was offered as a matter of someone else's opinion as opposed to a fact.

Even if the statement was made by a church member, St. Luke cannot be liable for "unauthorized gossip" spread by members of the church. *See Danawala v. Houston Lighting and Power Co.,* 14 F.3d 251, 255 (5th Cir. 1993) (employer not responsible for "unauthorized gossip" spread by co-worker) and *Martineau v. Arco Chemical Company*, 1998 WL 1173513 *13 (S.D. Tex. 1998) (unauthorized gossip of employees or supervisors cannot be imputed to an employer). Moreover, the statement made by an unknown SPPRC member that Ms. Kelly was "volatile" was merely stating an opinion and is therefore not a defamatory statement.

In *Martineau vs. Arco, supra,* the Plaintiff's supervisor told a co-worker that the Plaintiff was "insane, delusional and irrational." *Id.* at 12.  The Court held that *Arco* could not be held liable for its employee's unauthorized gossip where Plaintiff had not established how the supervisor's duties to Arco were to be advanced by the supervisor making the statement. *Id.* at 13.  The Court further held that the supervisor's statements were not defamatory because the Plaintiff offered no evidence that the supervisor used the terms literally and it was undisputed that the supervisor had no professional training that would enable him to make a professional evaluation. *Id.* at 12.  The Court held that the statements were merely opinions and therefore could not be defamatory. *See Carr v. Brasher* 776 S.W.2d 567, 570 (Tex. 1989).  All assertions of opinion are protected by the First Amendment of the U.S. Constitution. *Howell v. Hecht,* 821 S.W.2d 627, 631 (Tex. App – Dallas 1991, writ denied).

Since Ms. Kelly does not know who made the initial statement, she cannot establish that the person had professional training that would enable him or her to make a professional evaluation per the *Arco* decision.

Further, Ms. Kelly cannot establish other damages because the alleged publication of the "volatile" comment has not prevented her from obtaining employment. In Ms. Kelly's Responses to Interrogatory No. 23 of Defendant St. Luke's Second Set of Interrogatories, she admits that she has not been denied a position because someone stated she was "volatile". (*See* Appendix pp. 235-236, Kelly's Responses to Defendants Second Set of Interrogatories, Exhibit K, pp. 1-2.) She obtained a paid internship with First United Methodist Church of Dallas during 2013, i.e. after the "volatile statement" was made. Ms. Kelly admitted that she was selected for the position by First United Methodist Church. Ms. Kelly's ultimate goal is to become an ordained minister. Ms. Kelly did not testify this statement has prevented her from obtaining that goal.

      4.     Ms. Kelly's cannot establish that the actions of Rev. Masters or Ms. Washington constitute malicious conduct.

Ms. Kelly complains that the actions and statements made by Rev. Masters and Ms. Washington constitute malicious conduct. *See* Complaint [Dkt. No. 10 ¶¶ 50-51]. To the contrary, Rev. Masters and Ms. Washington both held no malicious intent for Ms. Kelly. Rev. Masters stated during the Church Council meeting on February 5, 2013, his rationale for the abolishment of the DOHR position and specifically stated that the decision was "not personal or malicious". *See* Appendix pp. 108-111, Minutes of the Church Council February 5, 2013 meeting, Exhibit B-10 p. 1. Further, the evidence establishes that Ms. Washington had no "malice" towards Ms. Kelly. When Ms. Washington made the announcement during the second church service on Sunday, February 3, 2013, Ms. Washington explained that the church would host a reception for Ms. Kelly due to her years of service with the church. (*See* Appendix pp. 186-189 Affidavit of Bernice Washington ¶ 12,

Exhibit G p. 3 and Appendix p. 201 and Letter dated February 4, 2013 from Bernice Washington to Evelyn Kelly advising Ms. Kelly that the church wanted to host a reception to celebrate her years of service attached hereto and incorporated herein as Exhibit G-4, p.1).

Further, even the presence of a police officer on Ms. Kelly's last day was not malicious conduct. Ms. Washington provided the following rationale for the presence of security, "at St. Luke, they have all information in their computer system of all the data on personnel, all of the information, no backstops. And Evelyn was the only one that had access to that or the director of operations was the only one that had access to all of that information. Generally my comments were around in corporate America, when a high level employee with access to sensitive information is asked to leave, it generally happens the same day that you advise them, and then you close down any security measures such as access to data bases and that kind of thing." *See* Appendix pp. 213-214 Dep. B. Washington, Exhibit H pp.36-37. Ms. Washington further explained that a Dallas police officer was used because the security company the church normally used had a 48-hour notice requirement before a guard could be present. *See* Appendix pp. 214-218, Dep. B. Washington, Exhibit H, pp. 37-41. Thus, based upon this testimony, t there was no malicious conduct committed by either Rev. Masters or Ms. Washington.

     5.     The Posting of the Elimination of the DOHR position does not constitute Defamation.

On February 1, 2013, the following statement was posted in St. Luke's newsletter: "St. Luke continues its quest to be the church that God has called us to be. Understanding the complex challenges and changes occurring in our community is an ongoing challenge. St. Luke "Community" UMC has made the decision to undergo a major reorganization to meet the challenge. As a result, the Director of Operations position has been eliminated." *See* Appendix pp. 113-116 Affidavit of

Rev. Masters ¶ 13, Exhibit C p. 3 and Appendix p. 143 Excerpt from the St. Luke Connection Newsletter attached hereto and incorporated herein as Exhibit C-5.

All of the information actually published by Rev. Masters and Ms. Washington was true. Moreover, the use of an off-duty policeman to escort Ms. Kelly to her office does not constitute defamation. Accordingly, there was no defamation per se or per quod .. Thus, for the foregoing reasons, Rev. Masters and Ms. Washington are entitled to summary judgment on Ms. Kelly's defamation claims.

## VII.
## CONCLUSION

**WHEREFORE, PREMISES CONSIDERED**, Defendants requests that this Court enter an order granting Defendants' Motion for Summary Judgment, that Plaintiff take nothing by her suit, that Defendants recover all costs of suit and attorneys' fees herein expended together with such other and further relief to which Defendants may be justly entitled.

Respectfully Submitted,

**WHITE & WIGGINS LLP**

 /s/ Camille Stearns Miller
Camille Stearns Miller
Texas State Bar No. 24030235
Kevin B. Wiggins
Texas State Bar No. 21441600
White & Wiggins LLP
1700 Pacific Avenue, Suite 3740
Dallas, Texas 75201
Telephone: (214) 665-4158
Facsimile: (214) 665-4160
Email: cstearnsmiiller@whitewiggins.com

**ATTORNEYS FOR DEFENDANTS**

## **CERTIFICATE OF SERVICE**

I certify that on May 18, 2015, a true and correct copy of the foregoing was electronically filed with the Clerk of this Court using the CM/ECF system, which will send notification of such filing to all interested parties.


**/s/ Camille Stearns Miller**
Camille Stearns Miller